**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MAKE THE ROAD NEW YORK; NEW YORK LEGAL ASSISTANCE GROUP; ASSOCIATION TO BENEFIT CHILDREN; AFRICAN COMMUNITIES TOGETHER,<br><br>Plaintiffs,<br><br>- against –<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY; MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security; UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES; and JOSEPH B. EDLOW, in his official capacity as Director of United States Citizenship and Immigration Services,<br><br>Defendants. | **COMPLAINT**<br><br>Case No. 1:26-cv-08129 |

Plaintiffs Make the Road New York ("MRNY"), New York Legal Assistance Group ("NYLAG"), Association to Benefit Children ("ABC"), and African Communities Together ("ACT"), for their complaint against Defendants United States Department of Homeland Security ("DHS"), United States Citizenship and Immigration Services ("USCIS"), and Joseph B. Edlow and Markwayne Mullin, in their official capacities, allege as follows:

**<u>PRELIMINARY STATEMENT</u>**

1. Plaintiffs bring this action under the Administrative Procedure Act ("APA") to challenge a rule promulgated by Defendants that will illegally deny lawful permanent resident ("LPR") status to aspiring immigrants on the ground that they are "likely . . . to become a public charge." Public Charge Ground of Inadmissibility, 91 Fed. Reg. 45324 (July 20, 2026) ("Rule"); *see also* 8 U.S.C. § 1182(a)(4)(A). Defendant agencies made a similar attempt during the first Trump Administration in 2019 to expand the statutory public charge ground of inadmissibility

beyond its long-settled meaning. *See* Inadmissibility on Public Charge Grounds, 84 Fed. Reg. 41292 (Aug. 14, 2019) ("2019 Rule"). Together, the Second Circuit and other Courts of Appeals held that their effort was likely contrary to law, in excess of legal authority, and arbitrary and capricious. *New York v. DHS*, 969 F.3d 42 (2d Cir. 2020), *cert. dismissed*, 592 U.S. 1314 (2021); *City & Cnty. of S.F. v. USCIS*, 981 F.3d 742 (9th Cir. 2020), *cert. dismissed*, 592 U.S. 1314 (2021); *Cook Cnty. v. Wolf*, 962 F.3d 208 (7th Cir. 2020), *cert. dismissed*, 592 U.S. 1314 (2021). For similar reasons, the Rule likewise violates the APA. It should therefore be vacated and set aside.

2. The stakes here are extraordinarily high. LPR status—commonly known as green card status—entitles noncitizens to live and work in the United States indefinitely and to petition for family members to join them here. LPR status is also a precondition for obtaining U.S. citizenship through naturalization. By contrast, aspiring immigrants who are refused LPR status on public charge or other grounds are vulnerable to deportation, regardless of the number of years they have lived here and the lives they have built. Expanding the public charge ground of inadmissibility, as the Rule seeks to do, thus has potentially life-altering adverse consequences for millions of law-abiding noncitizen residents—particularly those with low incomes and limited assets—who wish to keep their families together in the United States and build a better life here.

3. The Rule also creates enormous chilling effects on the lawful use of public benefits by noncitizens and their family members, with resultant grave damage to "public health, community stability, and resilience"—all effects that Defendants themselves acknowledge. 91 Fed. Reg. at 45361, 45418–19. The Rule confronts aspiring immigrants and their families with a stark choice: decline supplemental public benefits for which Congress, the States, and localities have made them (or their U.S.-citizen children) eligible, or accept such benefits and risk their long-term

ability to remain in the United States. By explicitly penalizing "intending immigrants" [1] for the supplemental benefits received by their children—a new feature not included in the 2019 Rule—Defendants practically ensure that the Rule will have a massive chilling effect. Indeed, Defendants estimate that the chilling effect of the Rule will result in an annual reduction of benefit payments of approximately $13 billion to some 2.1 million individuals and 59,000 households. *Id.* at 45469. And they acknowledge that, in turn, this reduced receipt of public benefits could have a range of deleterious effects on immigrant communities and the public at large, including "[w]orse health outcomes," "[h]igher prevalence of communicable diseases," "[i]ncreased rates of uncompensated care," and "[i]ncreased poverty, food insecurity and hunger, housing instability and homelessness, reduced productivity, lower educational attainment, and reduced participation in school meal programs." *Id.* at 45471.

4. The law does not permit Defendants to inflict these enormous harms. For more than a century, save for a brief period when the unlawful 2019 Rule was in effect, the public charge ground of inadmissibility under the Immigration and Nationality Act ("INA") and its predecessor statutes has consistently applied only to those who are primarily dependent on the government for support. In contrast, "the mere receipt of benefits from the government" does not render, and has never rendered, a noncitizen inadmissible as a public charge. *New York v. DHS*, 969 F.3d at 74. On the contrary, as the Second Circuit concluded in holding the 2019 Rule invalid, the public charge provision justifies denying LPR status only to noncitizens who are "likely to be unable to support themselves in the future and to rely on the government for subsistence." *Id.* The court further held that Congress ratified that long-settled interpretation of the statute as early as 1952 when it enacted the current INA—and thereafter repeatedly reenacted the statute without change and rejected

---

[1] "Intending immigrant" means any beneficiary of an immigrant visa petition filed under INA § 204, 8 U.S.C. § 1154, including any noncitizen who will accompany or follow-to-join the principal beneficiary. 8 C.F.R. § 213a.1 (2011).

efforts to expand that interpretation. *Id.* at 70–74. Just four years ago, DHS promulgated a regulation ("2022 Rule") codifying that settled interpretation after an extensive notice-and-comment process. Public Charge Ground of Inadmissibility, 87 Fed. Reg. 55472 (Sept. 9, 2022).

5. The Rule seeks to rescind substantially all of the 2022 Rule and strip away these long-settled limits on public charge determinations that the 2022 Rule reflected. It grants DHS officers unbridled discretion to deny aspiring immigrants LPR status for the receipt of supplemental public benefits for themselves or for their children in any amount and in any form. It even reaches a child's free lunch or Head Start slot at school, a Pell Grant for college, an Earned Income Tax Credit or Child Tax Credit, and other benefits the receipt of which has no bearing on whether someone is likely to become primarily dependent on the government. It thus improperly penalizes aspiring immigrants for receiving public benefits for which they are lawfully eligible or for having U.S. citizen children who receive such benefits. And it violates the settled meaning of "public charge" by effectively equating public charge status with the receipt of any such benefits, including nonmonetary benefits that are not intended or sufficient to provide basic sustenance. The Rule thus violates the APA because it is contrary to law and in excess of Defendants' statutory authority.

6. Similarly, the Rule revises the standards for determining whether a noncitizen has breached a statutory public charge bond (which in some circumstances can be posted to overcome a public charge finding of inadmissibility) in a manner the INA does not authorize. The Rule is contrary to law and in excess of authority for that reason as well.

7. The Rule also violates the APA because it is arbitrary and capricious. Defendants fail to provide adequate evidence or analysis justifying the Rule, and the justifications they proffer are inconsistent with the binding holdings of the Second Circuit and other Courts of Appeals. In

fact, Defendants' stated justifications for the Rule closely track arguments that those courts expressly rejected in considering the 2019 Rule. Further, Defendants fail to adequately account for critical relevant factors, including the chilling effect that the Rule will have on the lawful use of public benefits by noncitizens and citizens alike, as Defendants concede. The Rule also fails to take adequate account of noncitizens' reliance on the 2022 Rule. Nor have Defendants adequately addressed the near certainty that providing unfettered discretion to immigration officers to make public charge determinations will result in arbitrary and unfair decisions. While Defendants purport to address these factors, their explanations are entirely rote and conclusory.

8. After enacting the Rule, Defendants issued, without notice and comment, new guidance ("Guidance") regarding how immigration officers should make public charge determinations. *See* Ex. A, USCIS, PA-2026-09 Policy Alert: Public Charge Ground of Inadmissibility (Aug. 18, 2026). The Guidance confirms what the Rule already made clear: DHS now requires immigration officers to consider the receipt of "any and all" supplemental public benefits, including benefits designed to support immigrants' independence, without any meaningful limits on officers' discretion. *Id.* at 9. Moreover, it provides that the receipt of any such benefit "will almost always be highly relevant" to a public charge determination. *Id.* at 27.

9. The Guidance, like the Rule, violates the APA because it is contrary to law, in excess of Defendants' statutory authority, arbitrary and capricious, and improperly promulgated without notice and comment. Insofar as the Guidance requires immigration officers to penalize intending immigrants for the receipt of supplemental public benefits by themselves and their children for which they are lawfully eligible, the Guidance departs from the settled meaning of "public charge." Further, because the Guidance does not adequately explain its reasoning, does not adequately account for the reliance interests of intending immigrants, and summarily dismisses the chilling

effect that it will have on the use of important supplemental benefits programs by noncitizens and their children, the Guidance is also arbitrary and capricious. Finally, because the Guidance is intended to bind agency personnel and affects the legal rights of intending immigrants, it constitutes a legislative rule that should have been promulgated in accordance with notice-and-comment procedures.

10. Finally, the Rule and the Guidance are arbitrary and capricious for the additional reason that they are motivated by animus against low-income immigrants, particularly immigrants of color. Defendants seek to deny these immigrants LPR status and to make the lives of noncitizens as difficult as possible by discouraging them from receiving benefits for which they are eligible. It is working families like these from all over the world and past generations like them—seeking to obtain permanent status through the legal processes available under U.S. immigration laws—who have long helped build the United States. Never in the past would such immigrants have been excluded as public charges. Through this lawsuit, Plaintiffs seek to ensure immigrants remain free to contribute to our society without sacrificing the health and well-being of themselves, their children, or our communities.

11. For these and other reasons, the Rule and the Guidance violate the APA and should be declared unlawful, vacated, and set aside.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as this case arises under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, and the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.*

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1)(C) because no real property is involved in this action and Plaintiffs NYLAG and ABC reside in this District.

## PARTIES

14. **Plaintiff Make the Road New York ("MRNY")** is a nonprofit membership organization incorporated in New York with offices in Bushwick, Brooklyn; Corona, Queens; Brentwood, Long Island; Port Richmond, Staten Island; and White Plains, NY. MRNY was founded in 2007 and is currently the largest participatory immigrant organization in New York, with more than 29,000 members. MRNY's mission is to build the power of immigrant and working-class communities to achieve dignity and justice. It provides low-income and immigrant New Yorkers with an array of services, including education, health, housing, leadership development, civic engagement, and legal services. MRNY provides representation in immigration cases as a core component of its work. MRNY members lead organizing committees across MRNY's issue and program areas, take on leadership roles in its campaigns, determine its priorities, and elect the representatives who comprise the majority of the Board of Directors.

15. **Plaintiff New York Legal Assistance Group ("NYLAG")** is a nonprofit civil legal services organization dedicated to combating economic, racial, and social injustice. NYLAG addresses legal needs through free civil legal services, impact litigation, policy advocacy, and community education. To further its mission, NYLAG provides programming to help clients achieve financial empowerment and stable immigration status. NYLAG operates over 150 community sites across New York State. NYLAG's LegalHealth unit is the nation's largest medical-legal health partnership. LegalHealth partners with 38 hospitals and community-based health organizations to provide free legal services to their patients. LegalHealth trains healthcare professionals to understand that the social drivers of health often have legal solutions, allowing them to refer patients to LegalHealth's free, hospital-based legal clinics. LegalHealth attorneys then work as part of a patient's care team, providing representation in immigration, housing, public

benefits, advance planning, and other legal matters. NYLAG's principal place of business is in New York, New York.

16. **Plaintiff Association to Benefit Children ("ABC")** is a nonprofit dedicated to serving children struggling with the complex and compounded issues of poverty, hunger, emotional and physical abuse, lack of educational support, homelessness, disabilities, developmental delays, and/or medical fragilities. ABC is committed to serving the whole child and, accordingly, the whole family and community. ABC provides wide-ranging programming in early childhood education, youth development, children's mental health treatment, family preservation, community outreach, and supportive housing. ABC's principal place of business is in New York, New York.

17. **Plaintiff African Communities Together ("ACT")** is a national nonprofit membership organization of African immigrants fighting for civil rights, economic opportunity, and a better life for more than two million African immigrants and their families residing in the United States. ACT serves thousands of members across its chapters in in New York, Virginia, Maryland, Pennsylvania, and the District of Columbia, by providing legal assistance to members and clients on immigration matters and advice to members and clients who need access government benefits; organizing members around legal policy issues affecting African immigrants; and facilitating a national network of African leaders and African immigrant-serving organizations. Its staff consists of 31 lawyers, organizers, advocates, and support staff. Among ACT's members are residents of Maryland, Virginia, Pennsylvania, Washington, D.C., and New York City applying for and/or planning to apply for adjustment of status. ACT's principal place of business is located in New York, New York.

18. ACT sues on behalf of its members. At least one identified ACT member, Member A, will be imminently subject to the challenged Rule and Guidance when she files her Form I-485 application after September 18, 2026, and will suffer harm that is traceable to Defendants' Rule and Guidance that would be redressed by vacatur and injunctive relief. The claims and requested equitable relief do not require individualized proof or participation by members.

19. **Defendant DHS** is a cabinet department of the United States federal government. DHS has statutory responsibility for, among other things, administration and enforcement of certain portions of the INA.

20. **Defendant Markwayne Mullin** is the Secretary of Homeland Security. He is sued in his official capacity.

21. **Defendant USCIS** is the agency within DHS responsible for the administration of applications within the United States for immigrant and non-immigrant benefits, including adjudication of applications for legal permanent residence.

22. **Defendant Joseph B. Edlow** is the Director of USCIS, the component of DHS that oversees most adjustments of immigration status and that is responsible for promulgating the Rule. He is sued in his official capacity.

## FACTUAL ALLEGATIONS

23. The factual allegations in this Complaint are set forth in eight sections. Section I describes LPR status, the bases for adjustment, and the process an applicant for adjustment follows to obtain LPR status under current law, including the public charge provisions of the INA. Section I also describes the public charge bond framework. Section II discusses the historical interpretation of "public charge" in immigration law. Section III describes the Rule. Section IV describes the Guidance. Section V describes some of the supplemental public benefits encompassed by the Rule

and Guidance that provide support to individuals who work and children. Section VI describes how the Rule originates in and is aimed at effectuating and perpetuating animus against low-income, non-white noncitizens. Section VII describes the ways the Rule and the Guidance violate the Administrative Procedure Act, including that they are contrary to law, in excess of Defendants' authority, and arbitrary and capricious. Section VIII describes the harm that the Rule will inflict on Plaintiffs and their members, the communities in which they are located, and U.S. society as a whole.

## I. The Statutory Scheme Establishes Narrow Grounds for the Inadmissibility of Immigrants as Public Charges.

24. The INA defines "lawfully admitted for permanent residence"—i.e., LPR or green card status—to mean "the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws." 8 U.S.C. § 1101(a)(20). Intending immigrants who reside abroad may seek LPR status by applying for an immigrant visa at U.S. consulates, and such applications are adjudicated by consular employees of the Department of State. 8 U.S.C. § 1201; 22 C.F.R. §§ 42.61–42.74. Those who reside in the United States may seek such status from DHS through an application for "adjustment of status." 8 U.S.C. § 1255; 8 C.F.R. pt. 245. The Rule by its terms applies only to adjustment of status applications made by U.S. residents to DHS and adjudicated by DHS personnel.

25. LPR status carries enormous benefits for noncitizens. Once granted, it permits noncitizens to live and work in the United States permanently, as long as they abide by the law. It promotes family unity by giving an LPR the right to petition for certain family members to obtain LPR status. And it is a precondition for obtaining U.S. citizenship through naturalization.

26. The predominant path for intending immigrants to obtain LPR status is family-based immigration, which accounts for sixty-three percent of all adjustments to LPR status.[2] Additional paths to LPR status include (among others) employer sponsorship and the diversity visa lottery.

27. Section 212(a) of the INA lists a range of grounds for denying applications for admission and status adjustment. These include grounds related to health, criminal convictions, national security, and others. 8 U.S.C. §§ 1182(a)(1)–(10).

28. One basis for inadmissibility and consequent denial of status adjustment under Section 212(a) is the public charge ground. Under Section 212(a)(4), 8 U.S.C. § 1182(a)(4), a noncitizen who, "in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission or adjustment of status, is likely at any time to become a public charge is inadmissible." *Id.* § 1182(a)(4)(A). The public charge ground of inadmissibility applies to all intending immigrants seeking LPR status via family-based immigration, employer sponsorship, and the diversity visa program; various humanitarian categories of intending immigrants (including refugees and asylees) are exempt. While Section 212(a)(4) refers to the Attorney General, responsibility for public charge determinations in status adjustment has since been transferred from the Attorney General to the Secretary of DHS, and as a practical matter such determinations are made by employees of USCIS.[3]

29. The INA identifies five factors that DHS must consider in determining whether an intending immigrant is likely to become a public charge. These factors are: (i) age; (ii) health; (iii)

---

[2] Off. of Homeland Sec. Statistics, *U.S. Lawful Permanent Residents: 2024* (June 4, 2026), https://ohss.dhs.gov/topics/immigration/lawful-permanent-residents/annual-flow-report/fy-24-lpr-flow-report.

[3] *Poursina v. USCIS*, 936 F.3d 868, 869 n.1 (9th Cir. 2019) ("The statute's text authorizes the Attorney General to grant work visas, but Congress transferred that authority to the Secretary of Homeland Security in the Homeland Security Act of 2002. Pub. L. No. 107-296, § 1517, 116 Stat. 2135, 2311 (codified at 6 U.S.C. § 557).").

family status; (iv) assets, resources, and financial status; and (v) education and skills. 8 U.S.C. § 1182(a)(4)(B)(i).

30. The statute also permits DHS to "consider any affidavit of support" from a financial sponsor who pledges to provide a certain level of support to the intending immigrant, generally 125 percent of the federal poverty guidelines. *Id.* § 1182(a)(4)(B)(ii); *see also id.* § 1183a(f).

31. The INA permits an intending immigrant, even if deemed inadmissible under Section 212(a)(4), to nonetheless be admitted at the discretion of the Secretary "upon the giving of a suitable and proper bond or undertaking approved by the Attorney General . . . holding the United States and all States, territories, counties, towns, municipalities, and districts thereof harmless against such [noncitizen[4]] becoming a public charge." *Id.* § 1183.

32. Once an intending immigrant has been granted LPR status, the public charge ground of inadmissibility applies only in limited circumstances. For example, any LPR may be subject to renewed public charge inadmissibility review upon returning to the United States after a trip abroad of more than 180 days or under certain other circumstances.[5] Moreover, in the context of naturalization, USCIS may, in assessing whether an LPR seeking to naturalize had lawfully been admitted for permanent residence, evaluate whether the noncitizen had in fact been inadmissible at the time of admission or adjustment of status. 8 U.S.C. §§ 1255(a)(2), 1427(e).

33. Intending immigrants whose applications for adjustment of status are deniable on public charge grounds and who are not admitted under the public charge bond provision (or cannot

[4] This complaint uses the term "noncitizen" as equivalent to the statutory term "alien." *See, e.g.*, *Santos-Zacaria v. Garland*, 598 U.S. 411, 414 n.1 (2023) (*citing Nasrallah v. Barr*, 590 U.S. 573, 578 n.2 (2020)).

[5] When returning to the country after a trip abroad, certain LPRs may be subject to the grounds of inadmissibility under 8 U.S.C. § 1101(a)(13)(C) and thus face a public charge assessment, regardless of how they obtained LPR status. For example, LPRs who were not subject to a public charge assessment when they obtained LPR status, such as asylees, refugees, T visa holders, Special Immigrant Juveniles ("SIJ"), and Violence Against Women Act ("VAWA") self-petitioners nevertheless face a public charge review if subject to § 1101(a)(13)(C).

afford the bond) and who lack the protection of any current immigration status are vulnerable to being placed in removal proceedings under 8 U.S.C. § 1229a.

34. A separate provision of the INA provides that a noncitizen who was admitted or obtained status adjustment and thereafter becomes a public charge within five years of entry from causes not affirmatively shown to have arisen since entry, may be deportable. *Id.* § 1227(a)(5). The Rule does not address that deportability provision.

## II. The Public Charge Provision of the INA Has a Well-Settled Meaning Ratified by Congress and Endorsed by Courts Over More than a Century.

35. Since the public charge inadmissibility provision first became part of federal immigration law in 1882, courts and administrative agencies have—with the exception of the first Trump Administration's illegal and short-lived 2019 Rule—consistently interpreted the term "public charge" to mean noncitizens who rely primarily on the government for subsistence. Over the same period, Congress has repeatedly considered and uniformly rejected efforts to expand the meaning of the term in many of the ways the Rule seeks to do here.

36. The Second Circuit and other Courts of Appeal recognized and reaffirmed that longstanding interpretation. In litigation challenging the 2019 Rule (discussed further in Section II.E below), multiple Courts of Appeals held that the statutory term "public charge" refers only to persons unable to support themselves through work, savings, or family ties, and that the mere receipt of supplemental public benefits does not render a person a public charge.

37. Thus, as the Second Circuit explained in *New York v. DHS*, federal courts since the public charge provision was first enacted "emphasized the habitual and persistent nature of the dependency that would render one a public charge." 969 F.3d at 66; *see id.* at 65–68. The Seventh Circuit agreed that, "[h]istorically, with limited exceptions, temporary receipt of . . . supplemental benefits did not jeopardize an immigrant's chances of one day adjusting his status to that of a legal

permanent resident or a citizen." *Cook Cnty.*, 962 F.3d at 214. And the Ninth Circuit concluded that, historically, the "concept of becoming a 'public charge' has meant dependence on public assistance for survival" and, before the challenged 2019 Rule, "has never encompassed persons likely to make short-term use of in-kind benefits that are neither intended nor sufficient to provide basic sustenance." *City & Cnty. of S.F.*, 981 F.3d at 756.

38. The Second Circuit further held that Congress ratified this longstanding interpretation as early as 1952 and no later than 1996. It concluded:

> the absolute bulk of the caselaw, from the Supreme Court, the circuit courts, and the [Board of Immigration Appeals] interprets "public charge" to mean a person who is unable to support herself, either through work, savings, or family ties. Indeed, we think this interpretation was established early enough that it was ratified by Congress in the INA of 1952. But the subsequent and consistent administrative interpretations of the term from the 1960s and 1970s remove any doubt that it was adopted by Congress in [the Illegal Immigration Reform and Immigrant Responsibility Act, adopted in 1996 and discussed below].

*New York v. DHS*, 969 F.3d at 71 (internal citations omitted).

39. The historical interpretation of "public charge," from its origins in federal immigration law to the present, is described in further detail below.

### A. The Term "Public Charge" Has Long Been Understood to Refer Only to Those People Who Are Primarily Dependent on the Government for Support.

40. The term "public charge" first appeared in federal immigration law in the Immigration Act of 1882, 47th Cong., ch. 376, § 2, 22 Stat. 214 (1882) ("1882 Act"), which provided that "any person unable to take care of himself or herself without becoming a public charge" could be denied admission to the United States. Later bills changed the wording of the clause to "likely to become a public charge,"[6] which remains the statutory language today.

[6] *See, e.g.*, Immigration Act of 1891, 51st Cong., ch. 551, § 1, 26 Stat. 1084 (1891); Immigration Act of 1903, 57th Cong., ch. 1012, § 2, 32 Stat. 1213, 1214 (excluding from the United States "persons likely to become a public charge," among others); Immigration Act of 1917, 64th Cong. ch. 29, § 3, 39 Stat. 874, 876 (1917) (same); Immigration and

41. While the 1882 Act and its successors did not expressly define the term "public charge," Congress understood the phrase to refer to those who were likely to become long-term residents of "poor-houses and alms-houses"—i.e., persons who were institutionalized and wholly dependent on the government for subsistence. 13 Cong. Rec. 5109 (daily ed. June 19, 1882) (statement of Rep. George Davis). The public charge provision of the 1882 Act derived from similar provisions in state immigration statutes, which state courts had interpreted to refer to residents of public institutions for the destitute. At the same time that it enacted the public charge statute, Congress created a fund "for the support and relief" of arriving immigrants who "may fall into distress or need public aid," Pub. L. No. 47-376, ch. 376, §§ 1–2, 22 Stat. 214, demonstrating that it differentiated between "public charges," immigrants who were primarily dependent on the government for subsistence, and immigrants who needed temporary or supplemental benefits, *see New York*, 969 F.3d at 65.

42. Early judicial interpretations of the original public charge provisions in federal law confirmed that Congress did not intend the public charge exclusion to apply broadly to noncitizens who relied on assistance in a manner that did not indicate primary reliance on public benefits for subsistence. As the Second Circuit held in 1917, "[w]e are convinced that Congress meant [by public charge] to exclude persons who were likely to become occupants of almshouses for want of means with which to support themselves in the future." *Howe v. United States ex rel. Savitsky*, 247 F. 292, 294 (2d Cir. 1917); *see also Gegiow v. Uhl*, 239 U.S. 3, 9–10 (1915) (holding that the list of excludable immigrants in the Immigration Act of 1907, including those likely to become a

---

Nationality Act of 1952, 82nd Cong. ch. 477, § 212, 66 Stat. 163, 183 (1952) (excluding noncitizens "who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission, are likely at any time to become public charges").

public charge, meant to exclude immigrants "on the ground of permanent personal objections accompanying them").

43. Consistent with Congress's narrow understanding of public charge, federal immigration officials in the early 20th century excluded only a minuscule fraction of arriving immigrants on public charge grounds. According to DHS's own data, of the approximately 21.8 million immigrants seeking admission to the United States as lawful permanent residents between 1892 and 1930, approximately 205,000—less than one percent—were deemed inadmissible as likely to become public charges. The same has been true in subsequent years: between 1931 and 1980 (the last year for which DHS publishes such data), only 13,798 intending immigrants were excluded on public charge grounds compared to more than 11 million immigrants admitted as lawful permanent residents—an exclusion rate of approximately one-tenth of one percent. More recent statistics, shared in the Rule's Notice of Proposed Rulemaking ("NPRM"), are likewise consistent, indicating that, for the five-year period from Federal Fiscal Year 2020 through Federal Fiscal Year 2024, the average rate of public charge denials was 0.0958 percent, still less than one percent. Public Charge Ground of Inadmissibility, 90 Fed. Reg. 52168, 52207 (Nov. 19, 2025).

44. Decisions by the Board of Immigration Appeals ("BIA") throughout the mid-twentieth century reflected the original, narrow meaning of "public charge." In the leading case of *Matter of B-,* the BIA held that "acceptance by [a noncitizen] of services provided by a State . . . to its residents, services for which no specific charge is made, does not in and of itself make the [noncitizen] a public charge." 3 I. & N. Dec. 323, 324 (B.I.A. 1948).

45. In 1952, four years after *Matter of B-* was decided, Congress reenacted the public charge provision in the Immigration and Nationality Act of 1952 ("1952 Act," also known as the

McCarran-Walter Act). The Senate report accompanying the bill that became the 1952 Act carefully traced the administrative and court decisions interpreting the public charge provisions of the Act and proposed leaving the existing provisions unaltered. S. Rep. No. 81-1515, at 348–49 (1950). Consistent with that recommendation, the 1952 Act did not change the existing judicial and administrative interpretations. *See* 1952 Act, 66 Stat. 163, 183.

46. Administrative rulings by the BIA and the Attorney General following the enactment of the 1952 Act continued to recognize that the mere receipt of public benefits does not render a noncitizen a public charge. In *Matter of Martinez-Lopez*, Attorney General Robert F. Kennedy wrote that, to exclude a noncitizen as likely to become a public charge, "the [INA] requires more than a showing of a possibility that the [noncitizen] will require public support." 10 I. & N. Dec. 409, 421 (B.I.A. 1962; A.G. 1964). Instead, he explained:

> [s]ome specific circumstance, such as mental or physical disability, advanced age, or other fact reasonably tending to show that the burden of supporting the [noncitizen] is likely to be cast on the public, must be present. A healthy person in the prime of life cannot ordinarily be considered likely to become a public charge, especially where he has friends or relatives in the United States who have indicated their ability and willingness to come to his assistance in case of emergency.

*Id.* at 422 (collecting cases). Thus, as the BIA reiterated in *Matter of Perez*, "[t]he fact that [a noncitizen] has been on welfare does not, by itself, establish that he or she is likely to become a public charge." 15 I. & N. Dec. 136, 137 (B.I.A. 1974).

47. These administrative decisions continued to reflect a narrow definition of "public charge" despite the increasingly broad array of public benefits that became available for low-income people after the 1882 Act was enacted. These benefit programs included the Aid to Dependent Children program (1935), public housing (1937), food stamps (1964), Medicaid (1965), Supplemental Security Income (1972), and Section 8 housing vouchers (1974). Indeed, even prior to the New Deal—throughout the nineteenth and early twentieth centuries—states, counties, and

municipalities routinely provided temporary assistance to needy residents.[7] And prior to the enactment of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA"), discussed further below, many lawfully residing noncitizens were eligible for most federal public benefits without restriction.

48. In the Immigration Act of 1990 ("1990 Act"), Congress reenacted the public charge provision virtually unchanged from the 1952 Act. The legislative history of the 1990 Act again recognized that mere receipt of public benefits did not render an immigrant a public charge. A House Report explained that courts associated the likelihood of becoming a public charge with "destitution coupled with an inability to work," and noted the Supreme Court's ruling in 1915 that a person deemed likely to become a public charge "is one whose anticipated dependence on public aid is primarily due to poverty and to physical or mental afflictions."[8]

### B. PRWORA and IIRIRA Ratify Existing Law Regarding Public Charge Determinations and Confirm Noncitizen Eligibility for Public Benefits.

49. In 1996, Congress enacted two major pieces of legislation focused in part on the eligibility of noncitizens for public benefits and the INA public charge provision: PRWORA, colloquially called the "Welfare Reform Act," and the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"). Neither statute redefined "public charge" or altered the settled rule that the mere receipt of supplemental public benefits is not a basis for branding someone a public charge.

---

[7] *See* Michael B. Katz, *In the Shadow of the Poorhouse: A Social History of Welfare in America* 37–59 (10th ed. 1996).

[8] Staff of H. Comm. on the Judiciary, 100th Cong., *Grounds for Exclusion of Aliens Under the Immigration and Nationality Act: Historical Background and Analysis* 121 (Comm. Print 1988) (*citing Gegiow v. Uhl*, 239 U.S. 3 (1915)).

50. PRWORA significantly restricted certain noncitizens' eligibility for certain federal and state benefits. Pub. L. No. 104-193, § 403, 110 Stat. 2105, 2265–67 (1996). Some noncitizens were completely excluded from eligibility. But following the passage of PRWORA and subsequent legislation, certain classes of noncitizens remained eligible for federally funded government benefits, including Medicaid, food stamps (now the Supplemental Nutrition Assistance Program, or "SNAP"), Supplemental Security Income ("SSI"), Temporary Assistance for Needy Families ("TANF," a form of cash assistance), the Children's Health Insurance Program ("CHIP"), and the Special Supplemental Nutrition Program for Women, Infants, and Children ("WIC"). *See generally* 8 U.S.C. §§ 1612–1613. PRWORA also authorized states to choose to cover a broader group of noncitizens for eligibility in state public benefits programs. *Id.* § 1621.[9]

51. Nothing in PRWORA purported to change the meaning of "public charge" or overturned its longstanding administrative application. This was no oversight. On the contrary, PRWORA specifically added a new provision to the INA relevant to public charge determinations, requiring binding affidavits of support. Had Congress wanted the statute to change the settled interpretation of public charge to receipt of minimal amounts of any supplemental public benefits, it could have done so. Congress declined to make that change.

[9] In legislation following enactment of PRWORA, Congress expanded the availability of certain benefits, particularly SNAP, to so-called "qualified [noncitizens]." *See* Agricultural Research, Extension, and Education Reform Act of 1998 ("AREERA"), Pub. L. No. 105-185, §§ 503–08, 112 Stat. 523, 578–50 (restoring eligibility for certain elderly, disabled and child immigrants who resided in the United States when PRWORA was enacted); Farm Security and Rural Investment Act of 2002, Pub. L. No. 107-171, § 4401, 116 Stat. 134, 333–34 (restoring eligibility for SNAP to qualified noncitizens who have been in the United States at least five years and immigrants receiving certain disability payments and for children, regardless of how long they have been in the country). Recently, Congress once again restricted SNAP and Medicaid eligibility, without eliminating it entirely, to a smaller group of noncitizens: those who have LPR status, those classified as Cuban-Haitian entrants, and citizens of Micronesia, the Marshall Islands, and Palau under the Compact of Free Association ("COFA") agreements. H.R.1, One Big Beautiful Bill Act ("H.R. 1"), Pub. L. No. 119-21, §§ 10108, 71109, 139 Stat. 72, 85, 297–98 (2025). H.R. 1 did not address the definition of public charge whatsoever.

52. While PRWORA's statement of purpose expressed the policy that resident noncitizens "not depend on public resources to meet their needs," 84 Fed. Reg. at 41294, Congress concluded that policy was consistent with leaving the definition of public charge in the INA unchanged, affirming the eligibility of certain noncitizens for federal public benefits, and authorizing states to provide benefits to a broader group of noncitizens not eligible for federal benefits. As the Second Circuit explained,

> PRWORA did not eliminate non-citizen eligibility for benefits nor does it suggest that such drastic action is necessary. Still less does it indicate any congressional intention that non-citizens who receive the benefits for which Congress did not render them ineligible risk being considered "public charges." . . . Clearly, Congress decided that the benefits it preserved for non-citizens after PRWORA did not interfere with its interest in assuring non-citizen self-sufficiency.

*New York*, 969 F.3d at 77. DHS has previously conceded that "the INA does not mention self-sufficiency in the context of [public charge]." *See* 84 Fed. Reg. at 41355–56.

53. IIRIRA—which was passed the month after PRWORA—again made clear Congress's intention not to disturb the settled meaning of "public charge." IIRIRA reenacted the existing INA public charge provision relating to admission and status adjustment, and once again chose to leave the meaning of the term "public charge" unchanged. *See* 8 U.S.C. § 1182(a)(4). Instead, the statute provided that, consistent with prior case law, a public charge determination should take into account five minimum factors, including the applicant's age; health; family status; assets, resources, and financial status; and education and skills. *Id.* § 1182(a)(4)(B)(i). Mirroring PRWORA, IIRIRA also confirmed that immigration officers could consider a binding affidavit of support from an applicant's sponsor in making a public charge determination. *Id.* § 1182(a)(4)(B)(ii); *see id.* § 1183a. Since the enactment of PRWORA and IIRIRA, noncitizens seeking admission or adjustment have routinely been able to overcome a potential adverse public charge determination by filing a binding affidavit of support from a sponsor.

54. Nothing in IIRIRA altered the definition of public charge or reflected an intent by Congress to use the public charge provision to refuse admission or status adjustment based upon past or likely future receipt of supplemental public benefits.

55. Congress's decision to maintain the settled interpretation of "public charge" in IIRIRA was also no oversight. In the debate leading up to the enactment of IIRIRA, Congress considered and rejected a proposal to label as a public charge anyone who received certain supplemental public benefits including SNAP, Medicaid, and public housing. Immigration Control and Financial Responsibility Act of 1996, H.R. 2202, 104th Cong. § 202 (1996); *see* 142 Cong. Rec. S4401, S4408–09 (daily ed. Apr. 30, 1996) (statement of Sen. Alan Simpson); S. Rep. No. 104-249, at 63–64 (1996) (statement of Sen. Leahy); 142 Cong. Rec. S11872, S11881–82 (daily ed. Sept. 30, 1996) (statement of Sen. Jon Kyl).

56. As the Second Circuit held, Congress in enacting IIRIRA thus ratified the settled interpretation of "public charge" reflected in preceding judicial and administrative decisions. *New York*, 969 F.3d at 71.

### C. The 1999 Field Guidance Reaffirms the Settled Interpretation of Public Charge.

57. In 1999, approximately three years after the passage of PRWORA and IIRIRA (and during the administration of President Clinton, who signed both bills), the Immigration and Naturalization Service ("INS"), the predecessor agency to USCIS, issued its *Field Guidance on Deportability and Inadmissibility on Public Charge Grounds* ("Field Guidance"), 64 Fed. Reg. 28689 (Mar. 26, 1999), and a parallel proposed regulation, 64 Fed. Reg. 28676 (May 26, 1999). INS issued the Field Guidance and proposed regulation "[a]fter extensive consultation with benefit-granting agencies," 64 Fed. Reg. at 28692, and "to ensure the accurate and uniform application of law and policy in this area," *id.* at 28689. INS explained that the Field Guidance

"summarize[d] longstanding law with respect to public charge and provide[d] new guidance on public charge determinations." *Id*.

58. The Field Guidance defined a "public charge" as a noncitizen "who is likely to become (for admission/adjustment purposes) 'primarily dependent on the government for subsistence, as demonstrated by either (i) the receipt of public cash assistance for income maintenance or (ii) institutionalization for long-term care at government expense.'" *Id*. The Field Guidance expressly excluded from public charge determinations consideration of supplemental benefits programs such as Medicare, Medicaid, SNAP, and housing assistance. *Id*. INS explained that "[i]t has never been [INS] policy that any receipt of services or benefits paid for in whole or in part from public funds renders [a noncitizen] a public charge, or indicates that the [noncitizen] is likely to become a public charge." *Id*. at 28692.

59. INS explained that the definition of public charge adopted in the Field Guidance and proposed regulation comported with the plain meaning of "charge," as evidenced by dictionary definitions of the term as one "committed or entrusted to the care, custody, management, or support of another."[10] It reasoned that this definition "suggests a complete, or nearly complete, dependence on the Government rather than the mere receipt of some lesser level of financial support," and that this standard of primary dependence on public assistance "was the backdrop against which the 'public charge' concept in immigration law developed in the late 1800s." 64 Fed. Reg. at 28677.

60. INS further concluded that supplemental benefit programs should not be considered in public charge determinations because benefits under such programs "are by their nature

---

[10] 64 Fed. Reg. at 28677 (quoting *Webster's Third New International Dictionary of the English Language* 377 (1986) (defining "charge" as "a person or thing committed or entrusted to the care, custody, management, or support of another," and providing as an example: "He entered the poorhouse, becoming a county charge.") and 3 *Oxford English Dictionary* 36 (2d ed. 1989) (defining "charge" as "[t]he duty or responsibility of taking care of (a person or thing); care, custody, superintendence")).

supplemental and do not, alone or in combination, provide sufficient resources to support an individual or family." *Id*. at 28692. It explained that such benefits "are increasingly being made available to families with incomes far above the poverty level, reflecting broad public policy decisions about improving general health and nutrition, promoting education, and assisting working-poor families in the process of becoming self-sufficient." *Id*.

**D. Congress Again Declines to Expand the Meaning of Public Charge in 2013.**

61. The 1999 Field Guidance remained in place under presidents of both parties until 2019.[11]

62. During that period, Congress again rejected efforts to redefine public charge to include anyone receiving supplemental public benefits. While the Senate debated a bill that sought to create a path to citizenship for noncitizens who could show they were not "likely to become a public charge," S. 744, 113th Cong. § 2101 (2013), Senator Sessions sought to amend the definition of public charge to include receipt of "noncash employment supports such as Medicaid, the SNAP program, or the Children's Health Insurance Program," S. Rep. No. 113-40, at 42 (2013). The Senate rejected Senator Sessions's proposed amendment by voice vote. *Id*.

**E. The First Trump Administration Promulgates the Unlawful 2019 Rule, which Is Enjoined by Multiple Courts.**

63. In 2019, the first Trump Administration promulgated a regulation that—like the current Rule—sought to expand the scope of inadmissibility under the public charge provision ("2019 Rule"). Both the Second Circuit and other Courts of Appeals held that the 2019 Rule was contrary to the INA.

[11] The 1999 Field Guidance was reinstituted when the 2019 Rule was excised in March 2021. The Guidance rescinds the 1999 Field Guidance effective September 18, 2026. *See* Ex. A at 1.

64. The 2019 Rule mirrored a wide-ranging policy proposal published in April 2016 by the Center for Immigration Studies ("CIS"), a far-right group founded by white supremacist John Tanton and dedicated to immigration restrictionism.[12] The CIS publication that precipitated the Rule, "A Pen and a Phone: 79 immigration actions the next president can take," urged the next president to "[m]ake use of the public charge doctrine to reduce the number of welfare-dependent foreigners living in the United States."[13]

65. The 2019 Rule, published on August 14, 2019, branded as a public charge anyone who received any amount of specified supplemental public benefits (SNAP, Medicaid, and certain federal housing subsidies) that were excluded from public charge determinations under the 1999 Field Guidance, and provided that receipt of any such benefits in the three years preceding an application for status adjustment as a "heavily weighted negative factor" in determining whether the applicant was likely to become a public charge. 84 Fed. Reg. at 41458.

66. Twenty-three states and the District of Columbia, six municipalities, and a wide range of nonprofit public interest and immigrant rights organizations and individual plaintiffs challenged the 2019 Rule in lawsuits in five federal district courts, including in this District. All five courts concluded that the 2019 Rule likely violated the APA and issued injunctions blocking it.[14] The Supreme Court, without issuing an opinion or reaching the merits, stayed the injunctions

---

[12] *See* Southern Poverty Law Center's listing of Center for Immigration Studies as an "anti-immigrant hate group," S. Poverty L. Ctr., *Center for Immigration Studies*, https://www.splcenter.org/fighting-hate/extremist-files/group/center-immigration-studies (last visited Sept. 16, 2026).

[13] Ctr. for Immigr. Stud., *A Pen and a Phone: 79 Immigration Actions the Next President Can Take* (Apr. 2016), https://cis.org/sites/default/files/79-actions_1.pdf.

[14] *See City & Cnty. of S.F. v. USCIS*, 408 F. Supp. 3d 1057 (N.D. Cal. 2019), *aff'd in relevant part*, 981 F.3d 742 (9th Cir. 2020), *cert. dismissed*, 592 U.S. 1314 (2021); *Washington v. DHS*, 408 F. Supp. 1191 (E.D. Wash. 2019), *aff'd in relevant part*, 981 F.3d 742 (9th Cir. 2020), *cert. dismissed*, 592 U.S. 1314 (2021); *Make the Rd. N.Y. v. Cuccinelli*, 419 F. Supp. 3d 647 (S.D.N.Y. 2019), *aff'd as modified sub nom. New York v. DHS*, 969 F.3d 42 (2d Cir. 2020), *cert. dismissed*, 592 U.S. 1314 (2021); *Cook Cnty. v. McAleenan*, 417 F. Supp. 3d 1008 (N.D. Ill. 2019), *aff'd as modified sub nom. Cook Cnty. v. Wolf*, 962 F.3d 208 (7th Cir. 2020), *cert dismissed*, 592 U.S. 1314 (2021); *CASA de Md., Inc.*

in the New York and Illinois cases pending appeal,[15] thus temporarily permitting the 2019 Rule to go into effect. The Supreme Court, however, never reached the merits of the challenges to the 2019 Rule.

67. The Courts of Appeals that did reach the merits in these lawsuits, including the Second Circuit, largely agreed that the 2019 Rule departed from the INA's long-settled understanding of "public charge" and was likely arbitrary and capricious.[16] Collectively, these decisions confirmed the settled meaning of "public charge": a person primarily dependent on the government for subsistence. The Second Circuit concluded:

> [W]e hold that Congress ratified the settled meaning of "public charge" when it enacted IIRIRA. Congress intended the public charge ground of inadmissibility to apply to those non-citizens who were likely to be unable to support themselves in the future and to rely on the government for subsistence.

*New York*, 969 F.3d at 74; *see also City & Cnty. of S.F.*, 981 F.3d at 752 ("Until recently, the judicial and administrative guidance has reflected the traditional concept [of public charge] . . . of incapacity and reliance on public support for subsistence."); *id*. (concluding that the 1999 INS Guidance "embodied the traditional notion of primary dependence on the government for either income or institutional care").

---

*v. Trump*, 414 F. Supp. 3d 760 (D. Md. 2019), *rev'd*, 971 F.3d 220 (4th Cir. 2020), *reh'g on banc granted*, 981 F.3d 311 (4th Cir. 2020).

The Department of State (DOS) had introduced an interim final rule (IFR) on public charge, Visas: Ineligibility Based on Public Charge Grounds, 84 Fed. Reg. 54996 (Oct. 11, 2019), designed to bring parity to public charge determinations made in the context of consular processing and applications for adjustment. Plaintiffs obtained nationwide preliminary injunctions barring the implementation of that IFR and related policies, and they were never implemented. *See, e.g.*, *Make the Rd. N.Y. v. Pompeo*, 475 F. Supp. 3d 232 (S.D.N.Y. 2020).

[15] *Dep't of Homeland Sec. v. New York*, 589 U.S. 1173 (2020); *Wolf v. Cook Cnty*, 589 U.S. 1190 (2020).

[16] *See Cook Cnty*., 962 F.3d at 229, 232–33; *New York*, 969 F.3d at 76–78; *City & Cnty. of S.F.*, 981 F.3d at 750–54. The Fourth Circuit's panel decision in *CASA de Maryland*, 971 F.3d 220, is an outlier: it invoked *Chevron* and executive deference to uphold DHS's 2019 Rule at the preliminary injunction stage. Every other circuit to reach the merits rejected the Rule as inconsistent with the INA's long-settled understanding of "public charge" and likely arbitrary and capricious. The Fourth Circuit later granted rehearing *en banc*, thereby automatically vacating the panel ruling. *Casa De Maryland, Inc. v. Trump*, 981 F.3d 311, 314 (4th Cir. 2020).

68. These courts rejected DHS's contention in those cases that the receipt of supplemental public benefits by itself rendered a person a public charge. The Second Circuit held that

> *defining* public charge to mean the receipt, even for a limited period, of any of a wide range of public benefits—particularly . . . ones that are designed to supplement an individual's or family's efforts to support themselves, rather than to deal with their likely permanent inability to do so—is inconsistent with the traditional understanding of what it means to be a "public charge," which was well-established by 1996 [when IIRIRA was enacted].

*New York*, 969 F.3d at 78; *see also id*. at 85 ("DHS goes too far in assuming that all those who participate in non-cash benefit programs would be otherwise unable to meet their needs and that they can thus be categorically considered 'public charges.'"); *City & Cnty. of S.F.*, 981 F.3d at 756 ("From the Victorian workhouse through the 1999 Guidance, the concept of becoming a 'public charge' has meant dependence on public assistance for survival. Up until the promulgation of this Rule, the concept has never encompassed persons likely to make short-term use of in-kind benefits that are neither intended nor sufficient to provide basic sustenance."). The Seventh Circuit likewise rejected DHS's contention that a person receiving any public benefit, "particularly one related to core needs such as health care, housing, and nutrition," was thereby not self-sufficient. *Cook Cnty.*, 962 F.3d at 231; *see also New York*, 969 F.3d at 77 (stating that the court was "thoroughly unpersuaded" by DHS's argument that an alleged lack of self-sufficiency was equivalent to the receipt of means-tested supplemental public benefits such as SNAP, Medicaid, and federal housing benefits).

69. These courts also concluded that plaintiffs were likely to prevail in establishing that the proposed rule was arbitrary and capricious in violation of the APA. *New York*, 969 F.3d at 80–86; *City & Cnty. of S.F.*, 981 F.3d at 758–62; *Cook Cnty.*, 962 F.3d at 229–33.

70. In November 2020, an Illinois district court issued a final decision vacating the 2019 Rule as arbitrary and capricious and contrary to law. *Cook Cnty. v. Wolf*, 498 F. Supp. 3d 999, 1004–05 (N.D. Ill. 2020), *stay denied*, 141 S. Ct. 2562 (2021).

71. While the Supreme Court stayed the New York and Illinois preliminary injunctions pending appeal, *see* n.16 *supra,* and granted petitions for writs of certiorari of the Courts of Appeals' decisions, *e.g.*, *Dep't of Homeland Sec. v. New York*, 592 U.S. 1262 (2021), it never reached the merits of the Rule.

72. The 2019 Rule remained in effect until March 2021, when the Supreme Court dismissed the still-pending appeal of the Second Circuit's decision at the parties' request.[17] The resolution of the Second Circuit appeal also resolved the Seventh Circuit appeal, and the Illinois district court's decision vacating the 2019 Rule took effect.[18]

73. DHS subsequently withdrew the 2019 Rule to implement the district court's vacatur.[19] As a result, the 2019 Rule was removed from the Code of Federal Regulations, and the 1999 Field Guidance again controlled public charge assessments.

74. The chilling effect caused by the 2019 Rule has been well documented. *See infra* Section VIII. As DHS stated in the NPRM for the Rule:

> Studies conducted between 2016 and 2020 have shown reductions in enrollment [in public benefit programs] due to a "chilling effect," ranging from 4.1 percent to 48 percent. The largest disenrollment occurred between 2018 and 2019, coinciding with the publication and implementation of the 2019 Final Rule. Since the publication of the 2022 Final Rule, studies have highlighted the broad chilling

---

[17] *Dep't of Homeland Sec. v. New York*, 592 U.S. 1314 (2021).

[18] *See Mayorkas v. Cook Cnty.*, 592 U.S. 1314 (2021) (dismissing petition for writ of certiorari); *see also Cook Cnty. v. Wolf*, 498 F. Supp. 3d 999 (N.D. Ill. 2020).

[19] *See* Inadmissibility on Public Charge Grounds; Implementation of Vacatur, 86 Fed. Reg. 14221 (Mar. 15, 2021); *see also 2019 Public Charge Rule Vacated and Removed; DHS Withdraws Proposed Rule Regarding the Affidavit of Support* (Mar. 11, 2021), https://tinyurl.com/54c52b3n.

> effect public charge policy changes have had on enrollment rates across public benefit programs . . . .

90 Fed. Reg. at 52209 (citations omitted).

### F. The 2022 Rule Restores the Settled Understanding of the Meaning of Public Charge.

75. In December 2022, following an Advance Notice of Proposed Rulemaking[20] and a further Notice of Proposed Rulemaking,[21] DHS promulgated a new public charge rule ("2022 Rule") effective December 2022.[22] The 2022 Rule reversed the 2019 Rule and brought DHS back into alignment with the longstanding legislative and judicial consensus on the meaning of "public charge."

76. The 2022 Rule is consistent with the meaning of public charge ratified by Congress in IIRIRA, as reflected in the 1999 Field Guidance, and as affirmed by the Second, Seventh, and Ninth Circuits.

77. In adopting the 2022 Rule, DHS expressed its intent that the Rule be "consistent with congressional direction" and "effectuate a more faithful interpretation of the statutory phrase, 'likely at any time to become a public charge'" that reinstates "the longstanding purpose of the public charge ground of inadmissibility." 87 Fed. Reg. at 55472–74.

78. The 2022 Rule defines "public charge" as a noncitizen "primarily dependent on the government for subsistence, as demonstrated by either the receipt of public cash assistance for income maintenance or long-term institutionalization at government expense." 8 C.F.R. § 212.21(a) (2022). It provides that the determination of a noncitizen's likelihood of becoming a public charge "must be based on the totality of the [noncitizen's] circumstances," and requires

[20] Public Charge Ground of Inadmissibility, 86 Fed. Reg. 47025 (Aug. 23, 2021) ("2021 ANPRM").

[21] Public Charge Ground of Inadmissibility, 87 Fed. Reg. 10570 (Feb. 24, 2022).

[22] Public Charge Ground of Inadmissibility, 87 Fed. Reg. 55472 (Sept. 9, 2022).

consideration of the "minimum factors" set forth in the INA, including an affidavit of support. *Id.* § 212.22(a), (b). The 2022 Rule further provides that DHS will consider, in the totality of circumstances, the intending immigrant's "receipt of public cash assistance for income maintenance or long-term institutionalization at government expense" (including the amount, duration, and recency of the receipt of such benefits), but that the current and/or past receipt of such benefits "will not alone be a sufficient basis to determine whether the [noncitizen] is likely at any time to become a public charge." *Id*. § 212.22(a)(3). And it provides, consistent with the 1999 Guidance and the well-settled meaning of public charge on which it was based, that DHS will not consider receipt (or approval for future receipt) of other benefits, including supplemental benefits under SNAP, CHIP, and Medicaid or housing benefits. *Id.* The 2022 Rule also amended 8 C.F.R. §§ 103.6 and 213.1, pertaining to the acceptance, cancellation, and breach of public charge bonds. 87 Fed. Reg. 55476.

79. The 2022 Rule was intended to resolve the "undue fear and confusion" caused by the 2019 Rule, including its overbroad definition of public charge and mandatory consideration of past, current, and baselessly forecasted future receipt of certain benefits, as well as to address the harms caused by that definition and "widespread collateral effects." *Id*. at 55473. In reaching this conclusion, DHS reviewed extensive data in the administrative record that documented the chilling effects created by the 2019 Rule. Both noncitizens and their family members had disenrolled from benefits in large numbers due to fear and confusion about how the 2019 Rule would be applied. *See, e.g.*, *id.* at 55492, 55505. DHS also considered "a range of downstream consequences" due to these chilling effects, such as "avoidance of preventive medical care, children's immunizations, and nutrition programs." *Id.* at 55529. DHS also concluded that the 2019 Rule had severely impaired the health and wellbeing of noncitizens and their U.S.-citizen family members and

deterred people who were not subject to public charge from using public benefits. *Id.* at 55504–08.

80. The 2022 Rule contains features designed to quell the chilling effects caused by the 2019 Rule.[23] The 2022 Rule defines what constitutes "receipt" of cash assistance or government-funded long term institutional care to clarify that only the intending immigrant's actual receipt of benefits, for which they themselves are eligible, counts in a public charge determination—not benefits applied for but never received, and not benefits received by other household members, such as U.S.-citizen children.[24] The 2022 Rule also defines precisely which benefits do and do not count for public charge purposes, to provide clarity to stakeholders in the wake of the unlawful 2019 Rule, which had attempted to expand the categories of countable benefits. Further, the 2022 Rule eliminated the practice of assigning enhanced weight to certain factors and factual circumstances, which DHS identified as a source of undue fear and confusion.[25]

## III. The Rule Unlawfully Departs from the Settled Understanding of the Definition of Public Charge.

81. The principal stated purpose of the Rule is to abolish the 2022 Rule, to "mov[e] away from a bright line primary dependence standard" for public charge determinations, and to give DHS officers "broader discretion" to determine that intending immigrants are inadmissible on public charge grounds. 91 Fed. Reg. at 45324–25. In particular, the Rule provides that, in making public charge determinations, DHS employees "will consider the receipt of any means tested public benefits"—not only the cash benefits and long-term institutionalization that the public charge framework (including the 2022 Rule) contemplated. *Id*. at 45326. DHS justifies the

[23] *Id.* Other concerns included undue fear and confusion, unnecessary paperwork and administrative burdens, lack of administrability and complexity, inconsistent or unequal adjudications, and burdens on state and local governments and service providers. *Id.* at 55473–75.

[24] *Id.* at 55636–37.

[25] *Id.* at 55473.

Rule on the ground that "aliens subject to the public charge ground of inadmissibility should be self-sufficient and not depend on the government to meet their needs." *Id.* at 45411. DHS also justifies the Rule by citing to the need to "minimize the incentive for [noncitizens] . . . to immigrate to the United States due to the availability of public benefits." *Id.* at 45375.

82. The Rule rescinds all of the substantive provisions of the 2022 Rule other than those pertaining to public charge bonds, which it revises substantially. As DHS explained in issuing the Rule, it "completely remove[s] the public charge inadmissibility framework established by the 2022 Final Rule (with exception of the bond provisions)." 91 Fed. Reg. at 45357; *see id.* at 45477 (stating that 8 C.F.R. §§ 212.20 through 212.23 are "[r]emoved"). Thus, in particular, the Rule rescinds the definition of "public charge" in the 2022 Rule and all regulations governing the manner in which DHS officers make public charge determinations. *Id.*

83. The Rule was issued without material modification following an NPRM and an opportunity for public comment. DHS reports that it "received 8,846 comments on the proposed rule, the majority of which opposed the proposed rule." *Id.* at 45326.

84. The Rule repeatedly emphasizes DHS's intent to give wide discretion to its officers to determine that an intending immigrant is inadmissible under the INA public charge provision. It emphasizes that the Rule is intended to give "broader discretion for DHS officers" than the 2022 Rule in making public charge determinations. *Id.* at 45324. And, in response to concerns expressed by commenters that the Rule's reliance on DHS employees' discretion and the absence of clear guidelines would lead to unfair, arbitrary, or inconsistent public charge determinations, DHS asks the public to "[t]rust[] in the judgment of officers to make reasonable adjudicative decisions" and asserts that the INA permits "variability" in their decision-making. *Id.* at 45352.

85. DHS's clear purpose in adopting the Rule is to increase the number of noncitizens found inadmissible on public charge grounds. As DHS stated in the NPRM and reiterated in the Rule, a purported benefit of the Rule is that it will lead to "fewer [noncitizens] entering or remaining in the United States who are likely to receive public benefits." 90 Fed. Reg. at 52207; 91 Fed. Reg. at 45459.

86. To achieve that express aim, the Rule expands the applicability and impact of the public charge test in two primary ways.

87. First, the Rule radically expands the categories of public benefits that will be considered relevant to a public charge determination beyond the two categories of benefits that have historically been considered (cash assistance and long-term, government-funded institutional care) and even beyond the three additional categories of benefits added by the unlawful 2019 Rule (SNAP, Medicaid, and federal housing assistance). The Rule explicitly provides instead that DHS employees making public charge determinations should consider the applicant's receipt of "any and all" means-tested public benefits. 91 Fed. Reg. at 45387; *see also*, *e.g.*, *id.* at 45326 (stating that DHS officers "will consider" the receipt of "any means tested public benefits" on or after the Rule's effective date of September 18, 2026); *id.* at 45350, 45358, 45362 (same). DHS expressly states, for example, that it "will consider" an intending immigrant's receipt of time-limited, supplemental public benefits for pre- and postnatal care. *Id.* at 45367, 45398. It likewise does not dispute that the benefits to be considered include "Medicaid, SNAP, CHIP, Head Start, child care subsidies, including Military Child Care Subsidy Programs, State-facilitated universal pre-K programs, housing assistance, . . . disaster and non-disaster emergency shelter, housing, and food or temporary benefits offered to ameliorate the . . . []COVID-19[] . . . pandemic." *Id.* at 45387. Moreover, in the NPRM, DHS explained "that the current and/or past receipt of any means-tested

public benefit is a key gauge in determining [a noncitizen's] likelihood of dependence on the government and therefore to determining whether [a noncitizen] is inadmissible." 90 Fed. Reg. at 52189. Defendants thus place no limitation on the types of benefits relevant to the public charge inquiry.

88. Second, Defendants radically expand the class of *recipients* whose receipt of benefits will be considered beyond the intending immigrant seeking LPR status. DHS states that it intends to consider not only public benefits received by the intending immigrant, but also benefits received by the intending immigrant's dependents, including U.S.-citizen children. While DHS claims that the Rule does not "direct" DHS officers to consider "information about a[] [noncitizen's] family member's receipt of public benefits," it goes on to say that it *will* consider evidence that the intending immigrant's "family members whom the [immigrant] is legally obligated to support" receive such benefits. 91 Fed. Reg. at 45345, 45355, 45363–64, 45366, 45389. DHS has thus repeatedly communicated that the receipt of any public benefits by an intending immigrant's children, including U.S.-citizen children, will weigh against the immigrant's application for admission or status adjustment.

89. The combined effect of these two expansions permits an immigration officer making a public charge assessment to, for example, count the use of supplemental benefits by a U.S.-citizen child[26] to the same degree as a noncitizen's use of cash assistance benefits, even though Congress has, as a matter of national policy, made supplemental benefits broadly available to citizens, especially children, to promote nutrition, health, and well-being.

[26] While the Rule states that the receipt of benefits by U.S.-citizen children "will not be considered except in limited circumstances," 91 Fed. Reg. at 45361, the limited circumstances appear to be merely that the child is dependent on the parent. See, *e.g.*, *id.* at 45363–64. This is not limited at all. It describes the relationship that most children have to their parents.

90. The Rule also directs DHS employees to consider the receipt of public benefits by noncitizens who are statutorily exempt from public charge review (for example, refugees and asylees). It provides that if any such individuals later decide to adjust their status through a family member (and thereby become subject to public charge), the prior receipt of public benefits while exempt will be weighed in the public charge determination.[27] This was never the case under the 2019 or 2022 Rules, which explicitly protected exempt noncitizens from being penalized for using benefits while exempt.[28]

91. The Rule says that it does not establish any "specific weight" that officers must apply to "any particular factor," 91 Fed. Reg. at 45371, and states that DHS is not "designating any factors to be more heavily weighted than others in a public charge inadmissibility determination," *id.* at 45404.

92. The Rule also amends the regulations governing public charge bonds to make those bonds more onerous, and, in doing so, further confirms Defendants' intent to treat the receipt of any public benefits as rendering the recipient a public charge. Under the statute governing such bonds, 8 U.S.C. § 1183, a noncitizen ineligible for admission under the INA public charge provision may, if otherwise admissible, be admitted at the Secretary's discretion upon giving a

[27] *Id.* at 45406–07 ("if an alien who received means-tested public benefits while in a category that is exempt from the public charge ground of inadmissibility applies for admission or adjustment of status in a category that is not exempt from that ground, DHS will consider the receipt of those benefits").

[28] *See* 84 Fed. Reg. at 41501 (2019 Rule) (providing that regulations should include the language that "[i]n a subsequent adjudication for a benefit for which the public charge ground of inadmissibility applies, public benefits, as defined in this section, do not include any public benefits received by a[] [noncitizen] during periods in which the [noncitizen] was present in the United States in an immigration category that is exempt from the public charge ground of inadmissibility, as set forth in 8 CFR 212.23(a), or for which the alien received a waiver of public charge inadmissibility, as set forth in 8 CFR 212.23(b) ."); 8 C.F.R. § 212.22(d) (rescinded effective Sept. 18, 2026) ("In an adjudication for an immigration benefit for which the public charge ground of inadmissibility applies, DHS will not consider any public benefits received by an alien during periods in which the alien was present in the United States in an immigration category that is exempt from the public charge ground of inadmissibility, as set forth in § 212.23(a), or for which the alien received a waiver of public charge inadmissibility, as set forth in § 212.23(c)); 87 Fed. Reg. at 55569 (2022 Rule) ("DHS will not consider any public benefits received by a noncitizen during periods in which the noncitizen was present in the United States in an immigration category that is exempt from the public charge ground of admissibility.").

bond or undertaking that holds the United States and other government entities harmless "against such [noncitizen] becoming a public charge." 8 U.S.C. § 1183. The Rule, however, provides that a public charge bond submitted on or after its effective date is breached if the bonded noncitizen "receives *any* means-tested public benefit." 91 Fed. Reg. at 45476 (emphasis added) (amending 8 C.F.R. § 103.6(c)(1)). DHS justifies this amendment on the ground that it is necessary "to conform with the manner in which public charge inadmissibility determinations will be made" under the Rule. *Id*. at 45381–82. Further, the Rule eliminates the ability of USCIS to cancel a public charge bond after determining that the noncitizen is *not* likely at any time to become a public charge. *Id*. at 45325, 45476. Thus, an intending immigrant who accepts a public charge bond effectively agrees to never receive any public benefits whatsoever, even for a limited duration, for so long as they remain in LPR status, which could well be the rest of their life, lest the bond be breached.

93. DHS states that the Rule will take effect on September 18, 2026, and will apply to applications for admission or status adjustment submitted on or after that date. *Id.* at 45326. It further provides that, in making public charge determinations, it will not consider the receipt of public benefits other than cash assistance or long-term institutionalization at government expense before that date. *Id*.; *see also id*. at 45344.

**IV. The Guidance Confirms the Agency's Misreading of the Definition of Public Charge.**

94. Following promulgation of the Rule, USCIS issued new guidance instructing agency personnel on how to make public charge determinations. *See* Ex. A. The Guidance is adopted as amendments to Volume 8 of the USCIS Policy Manual.

95. Like the Rule, the Guidance does not exclude any public benefits from consideration: USCIS immigration officers are required to consider "any and all" means-tested public benefits received by an intending immigrant when determining whether the immigrant is a public charge. Ex. A at 9. The Guidance further provides that immigration officers should treat

"any current or past receipt of means-tested public benefits" as "highly relevant" to an intending immigrant's "likelihood at any time of becoming a public charge." *Id.* at 27; *see also id.* at 59 ("Among other factors that an officer should consider, any applications, approvals or certifications to receive, or receipt of means-tested public benefits . . . will be highly relevant.").

96. The Guidance requires immigration officers to consider not only the intending immigrant's receipt of these means-tested public benefits but also the receipt of these benefits by their children and other legal dependents. *See id.* at 15 (requiring consideration of whether noncitizens' "children or any other relative or household member the [noncitizen] is legally obligated to support receives means-tested public benefits"). The Guidance provides that immigration officers will consider the application for, certification of, or receipt of benefits for a period extending beyond September 18, 2026, unless the immigrant provides evidence of disenrollment or withdrawal from the benefits. *Id.* at 50.

97. The Guidance does not include any restrictions on the consideration of the receipt of means-tested public benefits by intending immigrants and their children or other safeguards that would ensure that public charge determinations are consistent with the settled meaning of the term. Likewise, the Guidance fails to offer any non-conclusory reasoning for the agency's decision to require consideration of whether an intending immigrant or their children have used means-tested public benefits programs when making public charge determinations. Nor does it meaningfully grapple with the consequences of that decision—including the predictable chilling effect on the use of critical benefits programs. The only reasoning provided by the Guidance is the barebones assertion that the agency now "believes that placing limits on the types of benefits and the time frame of receipt of such benefits is not the best implementation of the public charge inadmissibility statute." *Id.* at 10.

98. The Guidance also directs officers to decide how much weight to give a sufficient affidavit of support (Form I-864) by assessing the likelihood that a sponsor will "actually provide the statutorily-required amount of financial support" to the sponsored noncitizen, by, among other things, considering "[w]hether the sponsor is currently receiving means-tested public benefits." *Id.* at 49. This is not part of the statutory framework governing sponsors, which merely requires that they have a certain income level, generally at least 125 percent of the Federal Poverty Guidelines. 8 U.S.C. § 1183a; 8 C.F.R. pt. 213a (2011). And there is nothing inconsistent between meeting these income guidelines pertaining to sponsors and receiving supplemental public benefits. As set forth in Section IV, many supplemental public benefits are available to persons having income in excess of 125 percent of the federal poverty guidelines.

99. The Guidance makes clear that DHS employees are required to comply with its directives. USCIS characterizes the guidance as "controlling." Ex. A at 1. It states repeatedly that DHS employees "will" or "should" consider the receipt of public benefits when making public charge determinations, *e.g.*, *id.* at 15, 27, 50–52, and that the current or past receipt of such benefits "will" be "highly relevant" to such determinations, *id.* at 27, 59.

## V. The Supplemental Public Benefits Encompassed by the Rule and the Guidance Provide Support to Individuals Who Work and to Children.

100. The Rule expands the universe of public benefits relevant to the public charge inquiry to any means-tested benefit whatsoever, including supplemental benefits such as SNAP, Medicaid, and housing assistance, that historically have not been part of public charge determinations. The Second, Seventh, and Ninth Circuits have all held that the receipt of such benefits is consistent with self-sufficiency. *New York*, 969 F.3d at 85 ("Accepting help that is offered to elevate one to a higher standard of living, *help that was created by Congress for that precise purpose*, does not mean a person is not self-sufficient—particularly when such programs

are available not just to persons living in abject poverty but to a broad swath of low- and moderate-income Americans, including those who are productively employed."); *Cook Cnty.*, 962 F.3d at 232 ("[A]s numerous commenters on the Rule pointed out, the benefits it covers are largely *supplemental* and not intended to be, or relied upon as, a primary resource for recipients. Many recipients could get by without them."); *City & Cnty. of S.F.*, 981 F.3d at 749 ("The programs designated by the [2019] Rule are not intended to provide for subsistence but instead to supplement an individual's ability to provide for basic needs such as food, medical care, and housing."). Likewise, the INS recognized in the 1999 Field Guidance that these noncash benefits "are by their nature supplemental and do not, alone or in combination, provide sufficient resources to support an individual or family." 64 Fed. Reg. at 28692.

101. The same remains true today. People with incomes well above the poverty line, and, in some cases, with significant assets, continue to be eligible for SNAP, Medicaid, and federal housing benefits.[29] The other means-tested benefits newly included by the Rule likewise support working families and their children, often temporarily.

102. For example, the Earned Income Tax Credit ("EITC") and Child Tax Credit ("CTC") are intended to reduce taxes owed by low- to moderate-income workers. Only those who work and receive earned income, which includes taxable income and wages, qualify for the EITC and CTC. Similarly, Head Start and WIC are only available to eligible individuals for a limited

[29] For example, federal rental assistance programs target assistance to lower-income households (below 30 percent of Area Median Income ("AMI")), but a household can qualify for assistance with income up to 80 percent of AMI. *See* 42 U.S.C. § 1437a(b)(2) and 24 C.F.R. §§ 5.653, 960.201, 982.201. For a family of four in New York City 80 percent of the AMI is $135,680 per year, more than four times the Federal Poverty Guideline of $33,000 for a family of that size. N.Y.C. Dep't of Hous. Pres. & Dev., *Area Median Income*, https://www.nyc.gov/site/hpd/services-and-information/area-median-income.page (last accessed Sept. 2, 2026); *see* U.S. Dep't of Health & Hum. Servs., *U.S. Federal Poverty Guidelines Used to Determine Financial Eligibility for Certain Federal Programs*, https://aspe.hhs.gov/poverty-guidelines (last accessed June 24, 2026).

period and do not provide the means of subsistence. Head Start programs provide in-kind support for pregnant women and children from birth to age five through guided activities, medical, dental, and behavioral screening, and assistance to families with identifying and reaching goals around employment, training, and parenting. WIC provides free healthy foods, personalized nutrition education, breastfeeding support, and referrals to other services for pregnant women, children from birth to age five, living with a household income at or under 185 percent of the Federal poverty guidelines. These programs exist to keep children healthy, improve children's school performances, and increase earnings for the next generation.

103. The Pell Grant program is the largest source of federal grant aid supporting student access to higher education, and such grants are usually awarded to undergraduate students based upon financial need. The maximum Pell Grant award for the school year 2024–2025 was $7,395, an award that can only be used for tuition and textbooks and that is not sufficient for any student to rely on as a sole resource. As of 2025, Pell Grants are available to students with household incomes between $60,000 and $125,000.

104. Far from indicating a state of permanent destitution, these benefits promote healthy development and education that enhance financial independence later in life. None of these benefits is a proxy for the state of primary dependence that public charge has long been designed to capture.

## VI. The Rule Originates in and is Designed to Effectuate and Perpetuate Racial Animus Towards Low-Income, Non-White Noncitizens.

105. The true purpose of the Rule is demonstrated by repeated instances of rhetoric by the President and his Administration rooted in racialized stereotypes and debunked narratives

portraying immigrants and people of color as "tak[ing] welfare" and "extract[ing] wealth,"[30] and aligns with prior efforts by the Administration to restrict immigration from nonwhite countries.[31]

106. High-level administration officials, including officials at DHS and at the White House responsible for the Rule and immigration policy generally, subscribe to a conspiratorial "Great Replacement Theory" or "White Replacement Theory," which falsely imagines there has been an orchestrated plot to replace white Americans with nonwhite immigrants—a theory that animates this and other racist-exclusionary immigration policies.[32] Recent recruitment ads for Immigration and Customs Enforcement feature white supremacist slogans such as "Defend the Homeland" (with heroic depictions of white men from a bygone era) and "We'll Have Our Home Again," parroting a mantra from the white supremacist Proud Boys.[33] DHS recently posted a one-

[30] Department of State (@StateDept), X (Jan. 14, 2026 at 11:40 ET), https://x.com/StateDept/status/2011478657680757214.

[31] *See, e.g.*, Proclamation No. 10949, *Restricting the Entry of Foreign Nationals to Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats*, 90 Fed. Reg. 24497 (June 4, 2025); Proclamation No. 10998, *Restricting and Limiting the Entry of Foreign Nationals to Protect the Security of the United States*, 90 Fed. Reg. 59717 (Dec. 16, 2025); U.S. Citizenship and Immigration Services, DHS, PM-602-0192, *Policy Memorandum: Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries* (Dec. 2, 2025), https://www.uscis.gov/sites/default/files/document/policy-alerts/PM-602-0192-PendingApplicationsHighRiskCountries-20251202.pdf.

[32] *See, e.g.*, Jason Wilson, *Leaked emails reveal Trump aide Stephen Miller's white nationalist views*, Guardian (Nov. 14, 2019), https://www.theguardian.com/us-news/2019/nov/14/stephen-miller-leaked-emails-white-nationalism-trump; Ariana Figueroa, *Trump promises mass deportations of undocumented people. How would that work?*, Missouri Independent (Aug. 23, 2024), https://missouriindependent.com/2024/08/23/trump-promises-mass-deportations-of-undocumented-people-how-would-that-work/ ("I don't know if you call [immigrants] people. In some cases they're not people, in my opinion."); Ali Vitali, Kasie Hunt & Frank Thorp V, *Trump referred to Haiti and African nations as 'shithole' countries*, NBC News (Jan. 11, 2018), https://www.nbcnews.com/politics/white-house/trump-referred-haiti-africancountries-shithole-nations-n836946; *"The 'Great Replacement' Theory, Explained,"* National Immigration Forum (Dec. 1, 2021) https://forumtogether.org/article/the-great-replacement-theory-explained/.

[33] U.S. Dep't of Homeland Sec., *DHS Launches 'Defend the Homeland" Nationwide to Recruit Patriots to Join ICE Law Enforcement and Remove Worst of the Worst from U.S.* (July 29, 2025), https://www.dhs.gov/news/2025/07/29/dhs-launches-defend-homeland-nationwide-recruit-patriots-join-ice-law-enforcement; Homeland Security (@DHSgov), X, *Which way, American man?* (Aug. 11, 2025, 17:02 ET), https://x.com/DHSgov/status/1955011982488228231; Homeland Security (@DHSgov), X, *Defend The Homeland. Deport All Foreign Invaders* (Nov. 7, 2025, 11:11 ET), https://x.com/DHSgov/status/1986828779130409131; Homeland Security (@DHSgov), X, *We'll Have Our Home Again.* (Jan. 9, 2026, 15:58 ET), https://x.com/DHSgov/status/2009731611365941453; Letter from Sen. Sheldon Whitehouse, Ranking Member, S. Subcomm. on Fed. Cts., Oversight, Agency Action, and Fed. Rts., to Kristi Noem, Sec'y of Homeland Sec. (Feb. 23, 2026), https://www.whitehouse.senate.gov/wp-content/uploads/2026/02/2026-02-23-Letter-to-DHS-Recruitment.pdf.

word tweet: "Remigrate."[34] This word refers to the mass deportation of non-white immigrants, has ties to white nationalism, and has been seen as a euphemism for ethnic cleansing.[35]

107. President Trump has repeatedly demonstrated that public charge-related policies are motivated by racialized stereotypes and discriminatory animus against immigrants of color. On information and belief, his statements influenced the decision by other officials to publish the Rule. While campaigning in 2023 and 2024, President Trump explicitly expressed racist views regarding immigrants, and said that nonwhite, non-European immigrants "from Africa" and Asia are "poisoning the blood of our country."[36] President Trump additionally claimed that immigrants are "the leading cause of social dysfunction in America," "are on welfare, from failed nations, or from prisons, mental institutions, gangs, or drug cartels," and are responsible for "[f]ailed schools, high crime, urban decay, overcrowded hospitals, housing shortages, and large deficits."[37] He pined for white immigrants from Denmark, Norway, and Sweden, all countries which were spared from his 2026 State Department Blanket Visa Ban that also invoked public charge.[38] Previously, President Trump had signed Executive Order No. 14204, "Addressing Egregious Actions of the Republic of South Africa,"[39] which directed then Secretary Noem to admit white Afrikaners "who are victims

---

[34] Homeland Security (@DHSgov), X (Oct. 14, 2025, 15:06 ET), https://x.com/DHSgov/status/1978175527329358094.

[35] Chelsea Bailey, *DHS issued a call to 'remigrate.' Here's the history of the term often associated with far-right groups*, CNN (Oct. 19, 2025), https://www.cnn.com/2025/10/19/us/remigrate-dhs-explained.

[36] *Donald Trump on Illegal Immigrants "Poisoning the Blood of Our Country*," at 00:15–00:31, C-SPAN (Dec. 16, 2023), https://www.c-span.org/clip/campaign-2024/donald-trump-on-illegal-immigrants-poisoning-the-blood-of-our-country/5098439.

[37] Donald J. Trump (@realDonaldTrump), Truth Soc. (Nov. 27, 2025, at 11:27 ET), https://perma.cc/8JW9-D7B5.

[38] Amna Nawaz & Jonah Anderson, *Trump's affordability speech turns into a rant against immigrants*, PBS News (Dec. 10, 2025), https://www.pbs.org/newshour/show/trumps-affordability-speech-turns-into-a-rant-against-immigrants.

[39] Though only 7 percent of the population of South Africa is white, white farmers own over 70 percent of the country's commercial farmland. *The Facts: Land Reform in South Africa,* Action for Southern Africa (Feb. 19, 2025), https://actsa.org/the-facts-land-reform-in-south-africa/. In March 2025, President Trump posted on Truth Social that "any Farmer (with family!) from South Africa, seeking to flee that country to reasons of safety, will be invited into the United States of America with a rapid pathway to Citizenship. This process will begin immediately!" Donald J.

of unjust racial discrimination."[40] 90 Fed. Reg. 9497 (Feb. 7, 2025). These actions have dramatically altered the composition of U.S. refugee admissions: upwards of 99 percent of refugees admitted since October 2025 are white South Africans.[41] President Trump recently announced that he was set to double the amount of federal cash assistance to these individuals[42] despite prior commitments to denying immigrants aid upon arrival.[43] Former DHS Secretary Noem, who headed DHS when the NPRM was published, openly acknowledged that her actions as DHS Secretary were dictated entirely by the President and Stephen Miller. She explicitly stated: "Everything I've done, I've done at the direction of the President and Stephen."[44] She also shared the President's hostility towards nonwhite immigrants, especially those who use public benefits. She described Haitians—and people from eighteen other nonwhite countries—as "leeches," "entitlement junkies," and "foreign invaders" who "suck dry our hard-earned tax dollars," and expressly claimed that "WE DON'T WANT THEM. NOT ONE."[45]

---

Trump (@realDonaldTrump), Truth Soc. (Mar. 7, 2025, at 09:05 ET),https://truthsocial.com/@realDonaldTrump/posts/114121529754059509.

[40] Ted Hesson, *White South Africans Could Get 4500 Aid If They Come to U.S. as Refugees,* Wash. Post (Aug. 28, 2026), https://www.washingtonpost.com/immigration/2026/08/28/white-south-africans-could-get-4500-aid-if-they-come-us-refugees/.

[41] Mayeni Jones, *US has let in 4,499 refugees since October - all but three were South African*, BBC (Apr. 10, 2026), https://www.bbc.com/news/articles/c4g89kkvenqo.

[42] Hesson, *White South Africans Could Get 4500 Aid If They Come to U.S. as Refugees*, *supra* note 39 (federal resettlement assistance).

[43] In an interview with Breitbart News published on March 11, 2019, President Trump was quoted as saying "I don't want to have anyone coming in that's on welfare." Alexander Marlow, et al., *Exclusive—President Donald Trump on Immigration: 'I Don't Want to Have Anyone Coming That's on Welfare',* Breitbart (Mar. 11, 2019), https://www.breitbart.com/politics/2019/03/11/exclusive-president-donald-trump-on-immigration-i-dont-want-to-have-anyone-coming-in-thats-on-welfare/. He also retweeted a post stating, "RT if you agree: If you weren't born in the United States, you should receive $0 assistance." Philip Bump, *Trump retweeted a false claim about government benefits received by undocumented immigrant*s, Wash. Post (Nov. 28, 2018), https://www.washingtonpost.com/politics/2018/11/28/trump-retweeted-false-claim-about-government-benefits-received-by-undocumented-immigrants/.

[44] Marc Caputo, *Scoop: Blame game erupts over Trump team's false claim Alex Pretti sought "massacre,"* Axios (Jan. 27, 2026), https://www.axios.com/2026/01/27/trump-stephen-miller-massacre-minnesota-shooting.

[45] Special Envoy Kristi Noem (@EnvoyNoem), X (Dec. 1, 2025), https://x.com/EnvoyNoem/status/1995642101779124476?lang=en.

108. Defendants know that expanding the meaning of public charge to encompass any supplemental public benefit will result in more non-white immigrants being found inadmissible. They conceded that this was the impact of the 2019 Rule, which expanded the meaning of public charge to include just three additional categories of public benefits. 84 Fed. Reg. 41501. DHS publicly acknowledged that the 2019 Rule "may impact in greater numbers communities of color, including Latinos and [Asian Americans and Pacific Islanders], as well as those with particular medical conditions that require public benefits for treatment, and therefore may impact the overall composition of immigration with respect to these groups. 84 Fed. Reg. at 41369. At oral argument during one challenge to the 2019 Rule, DHS again admitted that immigrants of "Hispanic and African descent," could potentially fare worse than other noncitizens, as Defendants stated, "that's the same issue that would have applied under the [Field Guidance], which [Defendants] assume also would have had a disproportionate impact." Tr. of Oral Arg. at 81:10–16, *Make the Rd. New York v. Cuccinelli*, 419 F. Supp. 3d 647 (S.D.N.Y. 2019) (argued Oct. 7, 2019); *Cook Cnty.*, 461 F. Supp. 3d at 787 (stating that "DHS does not dispute ICIRR's allegation that the Final Rule will have a disproportionate negative impact on nonwhite immigrants. Indeed, DHS effectively acknowledged as much.").

109. Further evidence of the racial animus underlying the Rule is provided by two other contemporaneous actions governing public charge: (i) a categorical nationality-based ban on legal immigration for nationals of 75 countries ("Ban")[46] and (ii) the Consular Processing Cable,[47]

[46] *See* U.S. Dep't of State, *Immigrant Visa Processing Updates for Nationalities at High Risk of Public Benefits Usage* (last updated Aug. 28, 2026), https://travel.state.gov/content/travel/en/News/visas-news/immigrant-visa-processing-updates-for-nationalities-at-high-risk-of-public-benefits-usage.html; U.S. Dept. of State Consular Cable from Sec. of State Marco Rubio to All Diplomatic and Consular Posts, , *Pausing Immigrant Visa Issuances for Nationalities at High Risk of Public Charge*, 26 STATE 3740 (Jan. 14, 2026).

[47] U.S. Dept. of State Consular Cable from Sec. of State Marco Rubio to All Diplomatic and Consular Posts, *Visas: Properly Implementing the INA 212(a)(4) Public Charge Ineligibility*, 25 STATE 102426 (Nov. 6, 2025). Both the Ban

which amends the standards for public charge determinations made by Department of State officials. Those actions were, like the current Rule, issued together with official statements (albeit from the Department of State ("DOS"), rather than from DHS) that targeted immigrants who "take welfare" and "extract wealth" from Americans. DOS imposed the Ban based on an unsupported and demonstrably false claim that nationals of the covered countries migrate to the United States to improperly rely on cash welfare and are likely to become "public charge[s]."[48] The Ban overwhelmingly targets nonwhite and limited-English-proficient immigrants from nations across Africa, Asia, Latin America, and the Caribbean, categorically barring approval and issuance of all legal immigrant visas to nearly 90 percent of all African immigrant visa applicants, including nationals of over 30 countries in Africa, with nearly 70 percent of African nationalities represented; 8 countries in the Middle East, with half of all Middle Eastern nationalities represented; 15 countries in Latin America and the Caribbean, with over 42 percent of all Latin American and Caribbean nationalities represented; and 14 countries in Asia and Oceania. Over 85 percent of the countries covered by the Ban are non-European countries with significant nonwhite populations. At the same time, the Ban suspends visas from a small minority of European nations, with only seven countries impacted in southeastern Europe, representing less than 14 percent of European nationalities. In addition, the seven southeastern European nations have significant ethnic minority populations.[49]

---

and the Consular Processing Cable are being challenged in the case *Catholic Legal Immigration Network, Inc. v. Rubio,* No. 1:26-cv-00858, 2026 WL 2455099 (S.D.N.Y. Feb. 2, 2026).

[48] *See Immigrant Visa Processing Updates for Nationalities at High Risk of U.S. Public Benefits Reliance, supra* note 46.

[49] *See* David J. Bier, *New Ban Bars Half of Legal Immigrants, Even Citizens' Spouses & Kids*, Cato Institute: Cato at Liberty (Jan. 14, 2026), https://www.cato.org/blog/new-ban-hits-half-legal-immigrants-even-citizens-spouses-kids.

110. Similarly, one study of the 2019 Rule found that immigrant communities of color comprise 90 percent of the 25.9 million people who would be impacted by it.[50] Indeed, the 2019 Rule was predicted to create a higher risk of denial for immigrants from Mexico and Central America (with 60 percent of recent immigrants having two or more negative factors), the Caribbean (48 percent), Asia (41 percent), South America (40 percent), and Africa (34 percent) than for immigrants from Europe, Canada, Australia, and New Zealand, only 27 percent of whom could be expected to have two or more negative factors in the public charge calculus.[51]

111. The Consular Processing Cable targets family-based and diversity visa applicants, the vast majority of whom are nonwhite, and is based on the unsupported pretext that individuals seeking such visas are coming to the United States to use government benefits. It instructs the consular officials to, among other things, consider benefits and charity visa applicants received in their home country and mandates an English proficiency requirement that becomes a central factor, with instructions to conduct interviews in English whenever possible. This requirement serves to restrict nonwhite immigration: of the total foreign-born limited-English proficiency population residing in the U.S., 64 percent of them speak Spanish.[52]

112. The Rule will harm low-income, non-white noncitizens. The significant chilling effect that the Rule and Guidance will have, described in more detail below, is likely to fall disproportionately on nonwhite immigrants and their families (many including U.S. citizens of color). The harms caused to the up to 3.1 million members of immigrant families, including many

[50] Brittany Thomas, Nahal Zamani & JoAnn Kamuf Ward, Ctr. for Const. Rts. & Colum. L. School Hum. Rts. Inst., Comment on Proposed Rulemaking: Inadmissibility on Public Charge Grounds, at 6 (Dec. 10, 2018), https://www.regulations.gov/comment/USCIS-2010-0012-47813.

[51] Randy Capps et al., *Gauging the Impact of DHS' Proposed Public-Charge Rule on U.S. Immigration*, at 9, Migration Pol'y Inst. (Nov. 2018).

[52] U.S. Census Bureau, *Language Spoken at Home by Ability to Speak English for the Population 5 Years and Over*, 2023 American Community Survey 1-Year Estimates Detailed Tables: Table B16001, https://data.census.gov/table/ACSDT1Y2023.B16001 (last visited Sept. 16, 2026).

U.S. citizens, who DHS projects are likely to forgo Medicaid benefits each year as a result of the Rule, will fall disproportionately on low-income members of racial and ethnic minority groups, as was the case with respect to the 2019 Rule.[53] Indeed, a recent study by New York City's Department of Health and Mental Hygiene predicts that due to forgone health insurance and access to health care caused by the Rule, lawfully present noncitizens and Black immigrant New Yorkers are predicted to experience higher burdens of premature mortality attributed to the chilling effect compared with other immigrant and racial/ethnic groups.[54] An Urban Institute study conducted after the release of the 2019 Rule showed that 13.7 percent of adults in immigrant families reported avoiding non cash benefits out of fear for their or their family members' immigration status, and that concerns among Hispanics were more than double those of non-Hispanic whites.[55]

## VII. The Rule and its Implementing Guidance Violate the Administrative Procedure Act.

113. Both the Rule and the Guidance violate the APA in multiple respects. They are contrary to law and in excess of Defendants' statutory authority, and arbitrary, capricious, and an abuse of discretion. *See* 5 U.S.C. § 706. The Guidance also violates the APA because it was issued without following notice-and-comment procedures. *See id.* § 553(b).

### A. The Rule and the Guidance Are Contrary to Law, Including the INA, and in Excess of Defendants' Statutory Authority.

114. The Rule and the Guidance depart from the settled meaning of "public charge" set by Congress and recognized by the Second Circuit only six years ago. Both are contrary to law

[53] *See* Motion for Preliminary Injunction, Declaration of Leighton Ku, Ph.D., M.P.H., ¶ 9, *Make the Road N.Y. v. Cuccinelli*, 1:19-cv-07993-GBD (S.D.N.Y. Sep. 9, 2019), ECF No. 42 ("[t]hose harmed are disproportionally low-income members of racial and ethnic minority groups, especially Latino and Asian families.").

[54] Kaveri Nadhamuni et al., *The 2026 Public Charge Rule and Long-term Health Impacts among NYC Immigrants: A Simulation Study,* N.Y. City Dep't of Health and Mental Hygiene, (Jul. 27, 2026), https://www.medrxiv.org/content/10.64898/2026.07.23.26358686v1.full.pdf.

[55] Hamutal Bernstein et al., *With Public Charge Rule Looming, One in Seven Adults in Immigrant Families Reported Avoiding Public Benefit Programs in 2018*, Urban Inst., May 21, 2019, https://www.urban.org/urban-wire/public-charge-rule-looming-one-seven-adults-immigrant-families-reported-avoiding-public-benefit-programs-2018.

and in excess of Defendants' authority because they (a) equate "public charge" with the receipt of *any* means-tested public benefits; (b) authorize DHS employees to penalize intending immigrants and their family members for the past or present receipt of noncash, supplemental public benefits for which they are legally eligible; and (c) provide, contrary to the authorizing provision of the INA, that a public charge bond is breached whenever the beneficiary receives *any* means-tested public benefits, whether or not the beneficiary is a public charge.

*1. The Rule and the Guidance Improperly Equate "Public Charge" with the Receipt of Any and All Means-Tested Public Benefits.*

115. As discussed in Section II above, the Second Circuit and other Courts of Appeals have recognized that "public charge" encompasses people who are unable to support themselves and does not apply merely because a person receives means-tested public benefits. *See New York*, 969 F.3d at 70–80; *City & County of S.F.*, 981 F.3d at 749–53, 756–57; *Cook Cnty.*, 962 F.3d at 214, 228–29, 232–33. As the Second Circuit concluded, "Congress . . . eschew[ed] any idea that simply receiving welfare benefits made one a public charge." *New York*, 969 F.3d at 80.

116. In particular, the Second Circuit and other courts have squarely rejected the proposition that receipt of supplemental benefits that do not provide subsistence and that Congress made available to noncitizens renders a person a public charge. The Second Circuit explained:

> Accepting help that is offered to elevate one to a higher standard of living, help that was created by Congress for that precise purpose, does not mean a person is not self-sufficient—particularly when such programs are available . . . to a broad swath of low- and moderate-income Americans, including those who are productively employed. DHS goes too far in assuming that all those who participate in non-cash benefits programs would be otherwise unable to meet their needs and that they can thus be categorically considered "public charges."

*New York*, 969 F.3d at 85.

Likewise, the Seventh Circuit concluded:

> The INA does not call for total self-sufficiency at every moment; it uses the words 'public charge.' DHS sees 'lack of complete self-sufficiency' and 'public charge' as

> synonyms: in its view, receipt of any public benefit, particularly one related to core needs such as health care, housing, and nutrition, shows that a person is not self-sufficient. This is an absolutist sense of self-sufficiency that no person in a modern society could satisfy; everyone relies on nonmonetary governmental programs, such as food safety, police protection, and emergency services. DHS does not offer any justification for its extreme view, which has no basis in the text or history of the INA.

*Cook Cnty*, 962 F.3d at 231 (citations omitted); *see also City & Cnty. of S.F.*, 981 F.3d at 756 ("Up until the promulgation of this [2019] Rule, the concept [of 'public charge'] has never encompassed persons likely to make short-term use of in-kind benefits that are neither intended nor sufficient to provide basic sustenance.").

117. As DHS's explanations repeatedly emphasize, however, the Rule and the Guidance are intended to implement precisely the erroneous interpretation of "public charge" that Congress and the courts have rejected. *See*, *e.g.*, 91 Fed. Reg. at 45325; Ex. A at 1. Indeed, DHS expressly asserts that there is no distinction in the context of public charge determinations between means-tested public benefits that indicate a lack of self-sufficiency and those that are merely supplemental. 91 Fed. Reg. at 45343.

118. The Rule makes Defendants' intent unmistakable. It states that the Rule purpose is to "move[] away from a bright line primary dependence standard." 91 Fed. Reg. at 45325. The Rule goes on to state DHS's belief,

> that it is *any* receipt of a means-tested public benefit to meet the [noncitizen's] needs that Congress intended to address with the public charge ground of inadmissibility as it has existed since IIRIRA.

*Id*. at 45384 (emphasis added); *accord* 90 Fed. Reg. at 52186.

119. DHS's explanation of the Rule in no way withdraws or modifies any of these unequivocal statements of its intent; on the contrary, it reaffirms them. Indeed, DHS expressly asserts that there is no distinction in the context of public charge determinations between means-tested public benefits that indicate a lack of self-sufficiency and those that are merely

supplemental. 91 Fed. Reg. at 45343. The Second, Seventh, and Ninth Circuits squarely rejected that contention.

120. Likewise, the Guidance reiterates the agency's view that public charge determinations should make no distinction between means-tested public benefits that indicate a lack of self-sufficiency and those that are supplemental. Thus, the Guidance effectively treats "public charge" as meaning receipt of any "means-tested public benefits," which it defines to include all government benefits for which eligibility is determined by the applicant's income or assets, including not only forms of cash assistance but "food assistance, government-funded health coverage," or "public or assisted housing." Ex. A at 14; *see also id.* at 13 ("[O]fficers must determine whether [a noncitizen] is likely *at any time* to become a public charge, that is, likely at any time to depend on means-tested public benefits").

121. The Guidance directs immigration officers to treat the receipt of "any and all" means-tested public benefits as rendering a person a public charge. *Id.* at 9. That direction is contrary to the holdings of the Second, Seventh, and Ninth Circuits.

122. The Rule's revisions to the regulations governing public charge bonds also underscore DHS's equation of "public charge" with any receipt of means-tested public benefits, even supplemental benefits. The Rule provides that such a bond is breached if the bonded noncitizen receives "any means-tested public benefit." 91 Fed. Reg at 45476 (modifying 8 C.F.R. § 103.6(c)). DHS justifies this change as necessary to avoid "material inconsistencies between public charge inadmissibility determinations under the final rule and the public charge bond provisions." *Id*. at 45382. DHS thus acknowledges that public charge inadmissibility provisions under the Rule treat the receipt of *any* means-tested public benefit, even supplemental benefits, as equivalent to being a public charge—an equivalency that the courts have consistently rejected.

### 2. *The Rule Unlawfully Seeks to Penalize Immigrant Families for Receiving Supplemental Benefits for Which They Are Eligible.*

123. The Rule and Guidance are contrary to law and exceed Defendants' authority for the additional reason that they improperly permit DHS employees to rest a public charge finding on a noncitizen's receipt of supplemental public benefits, and thus to penalize intending immigrants for the receipt of supplemental benefits for which they are eligible under federal law. *See*, *e.g.*, 91 Fed. Reg. at 45343; Ex. A at 27.

124. But as the Second and Seventh Circuits have made clear, DHS may not penalize noncitizens for accepting supplemental benefits that Congress made available to them. *See New York*, 969 F.3d at 77–78; *see also Cook Cnty.*, 962 F.3d at 228. Instead, as the Second Circuit reasoned, PRWORA reflects Congress's view that self-sufficiency "does *not* anticipate abstention from all benefits use," and is entirely consistent with "[a]ccepting help that is offered to elevate one to a higher standard of living" under programs "available . . . to a broad swath of low- and moderate-income Americans, including those who are productively employed." *New York*, 969 F.3d at 81–82, 85.[56]

125. Because the Rule and Guidance purport to authorize DHS employees to penalize intending immigrants and their family members for receiving supplemental assistance for which they are eligible, the Rule and Guidance are contrary to law.

### 3. *The Bond Provisions of the Rule Violate the INA.*

126. The modifications to the public charge bond regulations under 8 C.F.R. § 103.6(c)(1) are also contrary to the INA.

[56] The Rule and Guidance also conflict with statutes in other ways. For example, they mandate that officers consider a noncitizen's receipt of SNAP, although Congress has dictated that SNAP benefits do not constitute income or resources under any federal, state, or local law. 7 U.S.C. § 2017(b).

127. Section 213 of the INA authorizes the Secretary to admit an otherwise inadmissible noncitizen upon the giving of a proper bond "holding the United States and all States. . . harmless against such [noncitizen] *becoming a public charge*." 8 U.S.C. § 1183 (emphasis added).

128. In contrast, as noted, the Rule provides that a public charge bond will be breached if the bonded noncitizen "receives any means-tested public benefit" at any time before death, permanent departure, or naturalization. 91 Fed. Reg. at 45476 (revising 8 C.F.R. § 103.6(c)) (emphasis added).

129. As previously shown, under the settled meaning of "public charge," receipt of any means-tested public benefit does not by itself render a person a public charge. By establishing that a bond is breached if a noncitizen receives any means-tested public benefit—whether or not the noncitizen becomes a public charge—the Rule violates the INA and exceeds DHS's statutory authority under 8 U.S.C. § 1183.

130. Because the Rule exceeds DHS's statutory authority under 8 U.S.C. §§ 1182(a)(4) and 1183 and is contrary to the clear, ratified intent of Congress, the Rule is not in accordance with law and must be vacated and set aside under 5 U.S.C. § 706(2).

131. Moreover, the INA does not permit Defendants to adopt regulations, guidance, or practices that define "public charge" inconsistently with the settled meaning of that term, as ratified by Congress. Because Defendants have done so, they have exceeded their statutory authority, and the Rule must be vacated and set aside for that reason as well.

**B. The Rule and the Guidance Are Arbitrary and Capricious.**

132. DHS's decision to rescind the 2022 Rule and adopt the Rule and Guidance in its place is arbitrary and capricious and therefore violates the APA. *See* 5 U.S.C. § 706(2)(A). Under the arbitrary and capricious standard, agency action must be both reasonable and reasonably

explained. In particular, the agency must (a) rest its action on legally permissible considerations; (b) adequately explain its reasoning; (c) consider all important aspects of the issue it seeks to address; (d) take account of reliance interests; and (e) not provide pretextual justifications. The Rule fails on all counts.

### *1. The Rule and Guidance Rest on a Legally Erroneous Premise.*

133. DHS primarily justifies the rescission of the 2022 Rule and the promulgation of new Guidance in its place on the basis that provisions in the 2022 Rule "straitjacket DHS officers' ability to make public charge inadmissibility determinations that are consistent with Congress's express national policy on welfare and immigration enacted in [PRWORA]" and the 2022 Rule therefore "was inconsistent with congressional intent." 91 Fed. Reg. at 45325, 45340.

134. This reasoning rests on a faulty reading of PRWORA and the INA. Neither law grants immigration officers unfettered discretion to make public-charge determinations. Likewise, neither PRWORA nor the INA requires immigration officers to consider public benefits other than cash assistance or long-term institutionalization when making public-charge determinations, and the consideration of those benefits is inconsistent with the settled meaning of the term "public charge," as used in the INA and ratified by Congress. Accordingly, insofar that DHS rescinded the 2022 Rule and promulgated the Guidance to align public-charge determinations with congressional intent, the agency acted based on a patent misreading of the relevant statutes.

135. In the 2019 Rule, DHS similarly stated that it adopted its new public charge definition to "align[] public charge policy with the self-sufficiency principles set forth in [PRWORA]." 83 Fed. Reg. at 51123. The Second Circuit rejected this explanation as arbitrary and capricious. The Court explained "that, contrary to DHS's belief, Congress's vision of self-sufficiency does *not* anticipate abstention from all benefits use." *New York*, 969 F.3d at 81–82. Ultimately, the Court concluded that the new public-charge definition could not be sustained on

the basis of an "agency justification that is unmoored from the nuanced views of Congress." *Id.* at 82. That holding is controlling here.

2. *The Rule Fails to Adequately Explain its Reasoning.*

136. A cardinal rule of administrative law is that an agency must engage in reasoned decision making. An agency must examine the relevant data and reasonably explain the connection between that data and the agency's decision. DHS failed to do so here. The explanations that DHS offers in support of its decision to rescind the 2022 Rule and to enact the Guidance are undeveloped and conclusory, falling well short of the reasoned, evidence-based decision-making the APA demands.

137. In addition to its purported desire to align public charge determinations with congressional intent, DHS offers two other related justifications for rescinding the 2022 Rule. First, the agency states that rescission of the 2022 Rule is necessary to permit immigration officers to make more accurate determinations about which noncitizens are not self-sufficient and are therefore likely to become public charges. 91 Fed. Reg. at 45331, 45341–42. Second, the agency suggests that rescission of the 2022 Rule is necessary to give immigration officers greater discretion to determine that a noncitizen is inadmissible on public-charge grounds. *Id.* at 45341.

138. Neither rationale is supported by any non-conclusory reasoning or evidence. For one, neither the Rule nor Guidance explains how expanding the scope of public benefits that can be assessed in making public benefits determinations will result in more accurate public charge determinations, nor does it explain why noncitizens using public benefits programs beyond those contemplated in the 2022 Rule and the similar Field Guidance are or are not likely to become public charges, under the settled and congressionally ratified definition of that term. Moreover, absent from both the Rule and the Guidance is any citation to empirical evidence showing that expanding the scope of public benefits leads to more accurate public charge determinations. For

instance, the agency fails to cite any evidence regarding the frequency with which noncitizens granted status adjustment under the 2022 Rule or the Field Guidance ultimately became public charges. Nor does the agency appear to even consider the risk that consideration of additional public benefits will lead DHS employees to erroneously *deny* status adjustments to noncitizens who will not become public charges. In lieu of evidence or analysis, the Rule and the Guidance rely entirely on *ipse dixit*.

139. Likewise, neither the Rule nor the Guidance explains why it is preferable to provide additional discretion to immigration officers making public charge determinations. The Rule merely asserts that additional discretion will allow immigration officers "to more accurately assess a [noncitizen's] likelihood at any time of becoming a public charge." *Id.* at 45331. But, again, the agency never cites any evidence substantiating its assertion that the new regime will allow more accurate public charge determinations, and the agency's evidence-free reasoning cannot withstand arbitrary-and-capricious review.

140. Critically, the 2022 Rule explained at length the advantages of cabining the types of public benefits that immigration officers can consider when making public charge determinations. In large part, the 2022 Rule aimed to provided a "clear and comprehensible" standard for public charge determinations that would facilitate "fair and consistent adjudications." 87 Fed. Reg. at 55473. The Rule never states why the agency is now rejecting that reasoning, beyond offering the conclusory assertion that expanding immigration officer discretion "will not lead to arbitrary, inconsistent, discriminatory, or erroneous outcomes." 91 Fed. Reg. at 45352. The agency offers no evidence that the absence of a clear and comprehensible standard will not result in inconsistent, discriminatory, or erroneous outcomes. Nor does the agency provide non-conclusory bases for rejecting the other rationales for the 2022 Rule.

141. Likewise, the Rule also seeks to justify rescission of the 2022 Rule on the ground that the 2022 Rule allegedly fails to require DHS employees making public charge determinations to consider "the totality of the [individual noncitizen's] circumstances" rather than "a rigid number of regulatory factors." 91 Fed. Reg. at 45336. This justification misreads the 2022 Rule, which expressly identifies the factors it identifies as "minimum" factors for consideration and directs DHS employees to determine a noncitizen's likelihood of becoming a public charge "based on the totality of the [noncitizen's] circumstances." 8 C.F.R. §§ 212.22(a), (b).

*3. DHS Failed to Consider Important Aspects of the Problem.*

142. In rescinding the 2022 Rule and enacting the Guidance, DHS failed to adequately consider important aspects of the problem. Indeed, the Rule is silent or scant on details regarding several significant policy concerns to which any reasoned decision-maker would have given considerable attention. Specifically, DHS failed to adequately consider that the rescission of the 2022 Rule would have a significant chilling effect on the use of important public benefits and the consequences of that effect on public health and community well-being. Nor did the agency consider the risk that providing unfettered discretion to immigration officers to make public-charge determinations would result in arbitrary and unfair decision-making.

143. Rescission of the 2022 Rule will discourage many people from using essential public benefit programs for which they are eligible. DHS itself acknowledges that the Rule will "result in a reduction in transfer payments . . . to individuals who may choose to disenroll from or forgo enrollment in a public benefits program," and estimates "that the total reduction in transfer payments" could amount to over "$13.05 billion annually." 91 Fed. Reg. at 45445, 45324. (As discussed below, Section VIII.A, DHS's estimates are likely substantially understated.) As a result, and as the agency concedes, the Rule may "negatively impact the health and education opportunities for children, including U.S. citizen children." *Id.* at 45364.

144. The 2022 Rule provided noncitizens (and U.S. citizens in mixed-status households) assurance that they could enroll in certain public benefits programs without the risk that their decision to use the benefits would later serve as the basis for a public-charge determination. Rescission of the 2022 Rule removes that certainty and creates a strong disincentive for noncitizens and their family members to use public benefits. While conceding that up to 2.1 million eligible noncitizens and U.S. citizens will choose to disenroll or not to enroll in public benefits programs, DHS does not look behind these numbers to consider downstream consequences that the chilling effect will have on public health and community well-being. While DHS makes a conclusory acknowledgment that downstream consequences will result, it fails to meaningfully weigh the conceded costs of disenrollment—including the cost of U.S.-citizen children losing access to health care, education, and other important benefits—against the purported benefits of rescinding the 2022 Rule. The failure to do so renders the Rule and the Guidance arbitrary and capricious.

145. DHS also fails to consider that rescinding the 2022 Rule will likely result in arbitrary and unfair decision-making. The 2022 Rule and the Field Guidance provided immigration officers with clear guidance regarding what factors should be considered when making a public-charge determination and mandated that officers explain in writing how they applied the factors. The elimination of these guardrails will permit immigration officers to make public-charge determinations based on their subjective views. DHS fails to adequately address the risks that immigration officers will now make inconsistent decisions and that any immigration officer's public-charge determinations may be infected by that officer's own biases or the perceived biases of the agency's political leadership.

146. Additionally, by defining public charge and lack of "self-sufficiency" to mean the use of any means-tested public benefits whatsoever, including supplemental benefits, DHS failed

to consider that an evaluation of the likelihood of a noncitizen's future use of public benefits is directly tied to the cost of living and median income levels in the locality where the noncitizen lives or intends to live—meaning that self-sufficiency is not an objective concept that can be applied fairly to each intending immigrant. For example, a household of four with a combined income of over $135,000 is eligible for Section 8 housing assistance in New York City,[57] where the cost of living is high, yet would be ineligible for such assistance due to excessive income in nearly every other city in the U.S. The Rule's self-sufficiency standard penalizes noncitizens living in high-cost areas that have chosen to fund public benefits intended to supplement residents' standards of living. The use of a public charge standard that is heavily influenced by the noncitizen's present or intended domicile—rather than their personal characteristics—is irrational.

*4. <u>The Rule Fails to Consider Important Reliance Interests.</u>*

147. DHS rescinds the 2022 Rule and the underlying Field Guidance without acknowledging and accounting for significant reliance interests: many people relied on the 2022 Rule and Field Guidance when deciding to receive certain public benefits. People elected to receive supplemental benefits while the 2022 Rule and Field Guidance were in place because they reasonably understood that the agency would not count the receipt of those benefits against them when making a public-charge determination.[58] Now, under the Rule, immigration officers can penalize noncitizens for the receipt of these same benefits on and after September 18, 2026. Many public benefits have annual recertification requirements, meaning that a recipient is presumptively

---

[57] *See* 24 C.F.R. §§ 5.653, 960.201, 982.201; N.Y.C. Dep't of Hous. Pres. & Dev., *Area Median Income*, https://www.nyc.gov/site/hpd/services-and-information/area-median-income.page (last accessed Sept. 16, 2026).

[58] This includes LPRs who had adjusted their status from a humanitarian status that is exempt from public charge and who have used means-tested benefits for which they are eligible. If such LPRs travel abroad and trigger any of the provisions of 8 U.S.C. § 1101(a)(13)(C), such that upon their return they newly become subject to the inadmissibility grounds at 8 U.S.C. § 1182(a), including public charge, the benefits they had lawfully used in reliance on the settled meaning of public charge would, under the Rule, provide new grounds to deny their admission.

eligible to continue receiving the benefit for the rest of the year after providing information regarding their income and household composition to the relevant agency.

148. The Rule penalizes noncitizens for the receipt of supplemental benefits on and after September 18, 2026, even when the noncitizen or their household members recertified prior to the Rule's publication date and counted on receiving the benefit for the rest of the year or other recertification period. For example, a noncitizen's household may have recently recertified for the Section 8 housing voucher program and entered into a corresponding lease agreement and now, due to the Rule, will face the choice of whether to disenroll from the voucher program and find a new apartment on the open market within a short period of time or risk a negative public charge determination. DHS's failure to account for these reliance interests of individuals who are already enrolled in public benefits programs renders the Rule arbitrary and capricious.

149. More fundamentally, immigrant families, like all U.S. families, make major life decisions based on their budget, which is informed by the availability of supplemental public benefits. For instance, a family may choose to stay in an expensive locale, like New York City, near family and community, based on an understanding that the high cost of living will be mitigated by the availability of various benefits. Someone may choose to move to a specific neighborhood because they know they will be eligible for subsidized housing or to enroll in a particular school because they will be eligible for need-based financial assistance. Similarly, someone may choose a job that does not provide benefits on the understanding that their children will be able to enroll in Medicaid or other public insurance programs. The Rule and the Guidance require intending immigrant adults and their children to disenroll from supplemental benefits programs previously made available to them at the risk of being found inadmissible. As a result, immigrant families who made important decisions about employment, housing, and education are now being forced

to reconsider those decisions—and potentially upend their lives—to account for new budgetary realities.

150. Neither the Rule nor the Guidance meaningfully account for these profound reliance interests. The agency acknowledges that the 2022 Rule and the Field Guidance engendered reliance interests but claims that those reliance interests are adequately protected by allowing individuals to disenroll from benefits prior to the Rule's effective date. *See* 91 Fed. Reg. at 45345–46 ("While DHS agrees [noncitizens] may have relied on the 2022 Final Rule when enrolling in certain means-tested public benefit programs, DHS addressed those reliance interests by clarifying previously excluded benefits are excluded from consideration if received before the effective date of this rule."). That misses the mark altogether. While affected individuals can potentially disenroll from benefits prior to the Rule's effective date, they cannot avoid the budgetary consequences of doing so. Nor can they change the fact that they have already structured their lives around an understanding that they were free to enroll in benefits for which they are eligible. Nowhere in the Rule or the Guidance does the agency acknowledge, much less grapple with, the fact that forced disenrollment will require immigrant families to reconsider an array of major life decisions made in reliance on the prior legal regime.

*5. The Rule is Arbitrary and Capricious, as it Relies on a False Pretext Whereas its True Motivation is Animus Toward Nonwhite Immigrants.*

151. The Rule uses a false pretext as cover for impermissible decision-making. The decision to enact a rule that is purportedly based on one rationale (making more accurate public charge determinations and furthering self-sufficiency), but that is, in reality, based on a separate rationale (anti-nonwhite immigrant animus), is arbitrary and capricious. Reliance on race or national origin animus is arbitrary and capricious as race or national origin-based decision-making is inherently illegitimate and irrational.

152. Independently, it is also arbitrary and capricious for an agency to purport and proclaim to act under one stated rationale but in reality be driven by a different rationale, particularly when the purported rationale is designed as cover for what would otherwise be plainly impermissible animus against nonwhite immigrants. As previously discussed, while the stated rationale for the Rule is to enable more accurate public charge determinations and to ensure that immigrants are self-sufficient, the true rationale rests on debunked narratives portraying immigrants and people of color as "taking welfare" and "extracting wealth," and aligns with prior efforts by the Trump Administration to restrict immigration from nonwhite countries. These purported justifications are a pretext for discrimination against nonwhite immigrants—even those who are complying with the country's long-standing rules for obtaining lawful residence.

**C. The Guidance Unlawfully Failed to Follow Notice-and-Comment Rulemaking.**

153. The Guidance is separately unlawful because it did not follow notice-and-comment procedures. The 2022 Rule was issued pursuant to notice and comment, but the agency elected to replace the 2022 Rule with a new regime in part through the issuance of subregulatory guidance on which the public never had the opportunity to comment. Indeed, in explaining its decision to rescind the 2022 Rule, the agency repeatedly points to its planned subregulatory guidance and invokes the forthcoming guidance in response to various comments but expressly declines to provide the public an opportunity to comment on the Guidance. 91 Fed. Reg. at 45338–40.

154. The Guidance constitutes a legislative rule that was required to undergo notice and comment for the reason that it establishes binding rules that govern public charge determinations and substantively narrow the rights of noncitizens seeking to adjust status.

## VIII. The Rule and Guidance Will Cause Enormous Harm to Immigrant Families, Society, and Plaintiffs.

155. The Rule and Guidance will cause enormous harm to millions of U.S. citizens and noncitizens and the communities in which they live. It will also cause (and has already caused) direct harm to Plaintiffs, nonprofit organizations that provide legal assistance, health care, nutritional assistance, Head Start, and assistance in obtaining access to benefits to non-citizens and their U.S. citizen children, including intending immigrants who will face public charge determinations under the Rule and Guidance.

### A. Defendants Concede the Rule Will Deter Immigrant Families from Using Public Benefits for which They Are Eligible.

156. Defendants concede in the Rule and NPRM that the rescission of the 2022 Rule is likely to cause a decrease in the participation of non-citizens and their children in a range of public benefits. *See, e.g.,* Rule, 91 Fed. Reg, at 45460; NPRM, 90 Fed. Reg. at 52171, 52208, 52218. Defendants concede that the decreased participation will lead to a range of "downstream and upstream" impacts. *See, e.g.* Rule, 91 Fed. Reg. 45446, 45471, NPRM, 90 Fed. Reg. 52208. Defendants acknowledge the broad range of the studies conducted to capture the chilling effect

and other negative consequences of the 2019 Rule, in the NPRM[59] and the Rule,[60] and incorporated much of that research into its methodology for studying the impact of the Rule.[61]

157. Despite acknowledging this body of research documenting the negative impacts of expanding public charge to include means-tested benefits beyond cash assistance and long-term institutional care, Defendants repeatedly suggest that the harms are indirect and that they are

---

[59] *See, e.g.,* NPRM, 90 Fed. Reg. at 52209 n.159-168 (citing Rand Capps, et. al., *Anticipated 'Chilling Effects' of the public-charge rule are real: Census data reveals steep decline in benefits used by immigrant families,* Migration Policy Institute (Dec. 2020), https://www.migrationpolicy.org/news/anticipated-chilling-effects-public-charge-rule-are-real; Hamutal Bernstein, et al., *Immigrant Families Continued Avoiding the Safety Net during the COVID–19 Crisis*, Urban Institute (Feb. 1, 2021), https://www.urban.org/research/publication/immigrant-families-continued-avoiding-safety-net-during-covid-19-crisis; Drishti Pillai, Samantha Artiga, *'2022 Changes to the Public Charge Inadmissibility Rule and the Implications for Health Care*,' Kaiser Family Foundation (KFF) (May 5, 2022), https://www.kff.org/racial-equity-and-health-policy/2022-changes-to-the-public-charge-inadmissibility-rule-and-the-implications-for-health-care/; Kaiser Family Foundation (KFF), *Key Facts on Health Coverage of Immigrants* (Jan. 15, 2025), https://www.kff.org/racial-equity-and-health-policy/key-facts-on-health-coverage-of-immigrants/; Hamutal Bernstein et al., *"Immigrant Families Faced Multiple Barriers to Safety Net Programs In 2021,"* Urban Institute (Nov. 10, 2022), https://www.urban.org/research/publication/immigrant-families-faced-multiple-barriers-safety-net-programs-2021; Dulce Gonzalez, Jennifer Haley, and Genevieve Kenney, *'One in Six Adults in Immigrant Families with Children Avoided Public Programs in 2022 Because of Green Card Concerns*,' Urban Institute (Nov. 30, 2023), https://www.urban.org/research/publication/one-six-adults-immigrant-families-children-avoided-public-programs-2022; Dulce Gonzalez and Hamutal Bernstein, *'One in Four Adults in Mixed-Status Families Did Not Participate in Safety Net Programs in 2022 Because of Green Card Concerns*,' Urban Institute (Aug. 17, 2023), https://www.urban.org/research/publication/one-four-adults-mixed-status-families-did-not-participate-safety-net-programs; NPRM, 90 Fed. Reg at 52217 ("DHS acknowledges prior studies that examines disenrollment or forgone enrollment due to public charge regulatory effects, which reported higher disenrollment rates."); *id.* at 52218 (acknowledging that reduced income and increased poverty would disproportionately affect children, leading to 3.2 million fewer people receiving Medicaid leading to 4,000 excess deaths) (*citing* Leighton Ku, *'New Evidence Demonstrates That the Public Charge Rule Will Harm Immigrant Families and Others*, Health Affairs (Oct. 9, 2019), https://www.healthaffairs.org/content/forefront/new-evidence-demonstrates-public-charge-rule-harm-immigrant-families-and-others.

[60] *See, e.g.,* Rule, 91 Fed. Reg. at 45366 n. 171 (Drishti Pillai, Samantha Artiga, et al., KFF, *KFF/New York Times 2025 Survey of Immigrants: Health and Health Care Experiences During the Second Trump Administration* (Nov. 18, 2025), https://www.kff.org/immigrant-health/kff-new-york-times-2025-survey-of-immigrants-health-and-health-care-experiences-during-the-second-trump-administration/); Rule, 91 Fed. Reg. at 45426 n. 205 (citing Capps 2020, Bernstein 2021, KFF 2025, Bernstein Gonzalez 2022; Gonzalez 2023; Gonzalez and Bernstein 2023); Rule, 91 Fed. Reg. at 45460 ("DHS assumes similar transfer payments and indirect effects may occur under this rule, as was discussed in the 2019 Final Rule."); *id.* at 45461-62 (describing studies on chilling effect caused by the 2019 Rule).

[61] *See* NPRM, 90 Fed. Reg. at 52209 (assuming an average disenrollment rate of 17.3 percent based on studies conducted between 2022 and 2025); *id.* (using a range of rates due to the uncertainty of the rate of reduced participation related to the 2019 and 2022 rules, from 3.3 as the lower bound rate to 17.3 as the upper bound, with 10.3 as the primary estimate); Rule, 91 Fed. Reg. 45426-27 ("DHS uses the average of these same studies, focusing only on studies conducted between 2022 and 2025, in this final rule, as it represents the uncertainty in disenrollment and forgone enrollment of the specific population discussed in this rule") (citations omitted); *id.* at 45460 ("DHS assumes similar transfer payments and indirect effects may occur under this rule, as was discussed in the 2019 Final Rule.");

outweighed by the alleged benefit of better aligning administration of the public charge ground of inadmissibility with PRWORA's Congressional findings.

158. Defendants estimate that the Rule will cause a 10.3 percent rate of decrease in participation in selected federal benefits programs (Medicaid, CHIP, WIC, SNAP, TANF, SSI, and federal rental assistance) amounting to a reduction of $7.71 billion (affecting 1,265,993 individuals and 35,294 households), Rule, 91 Fed. Reg. at 45462, with a reduction in state transfer payments of approximately $4.05 billion, *id.* at 45468, for a total of nearly $13 billion in reduced participation in government benefits programs per year. *Id.*

159. Defendants further acknowledge that such decreased participation in benefits programs will have a wide range of downstream and upstream effects on immigrants, citizens, and their communities. These include:

- Worse health outcomes, such as increased prevalence of obesity and malnutrition (especially among pregnant or breastfeeding women, infants, and children), reduced prescription adherence, and increased use of emergency rooms for primary care due to delayed treatment.
- Higher prevalence of communicable diseases, including among U.S. citizens who are not vaccinated.
- Increased rates of uncompensated care, where treatments or services are not paid for by insurers or patients.
- Increased poverty, food insecurity and hunger, housing instability and homelessness, reduced productivity, lower educational attainment, and reduced participation in school meal programs.

91 Fed. Reg. at 45471.

160. DHS also acknowledges that reductions in benefits transfers may also have substantial effects on state and local economies, businesses, and individuals. *Id.* Looking at the impact of reduced enrollment in Medicaid and SNAP alone, DHS estimates could lead to:

- Lower revenues for healthcare providers participating in Medicaid, to include hospitals, medical providers, and pharmacies, and/or loss of Medicaid

reimbursement for special education services.

- Reduced income for companies manufacturing medical supplies or pharmaceuticals.
- Decreased sales for grocery retailers participating in SNAP, to include farmer's markets, and agricultural producers.
- Economic impacts on agricultural producers supplying SNAP-eligible foods.
- Financial strain on landlords participating in federally funded housing programs, such as increased tenant turnover and higher administrative costs.

91 Fed. Reg. at 45471.

161. Each of these effects is a harm caused by the Rule and the Guidance.

162. Defendants additionally acknowledge the negative impacts that the Rule will have on different segments of the U.S. population and society, including children. *See, e.g.,* 91 Fed. Reg. at 45363 (children); *id.* at 45367 (pregnant people); *id.* at 45367 (people with disabilities); *id.* at 45369 (survivors of violence and trafficking); *id.* at 45370 (childcare workers and business owners); *id.* at 45420 (school and education system).

163. Defendants' predictions of decreased participation are likely an underestimate of the impact of the Rule and Guidance.

164. First, Defendants acknowledge that the rate of decreased participation could be an undercount. *See, e.g.,* Rule, 91 Fed. Reg. 45427 ("[D]ue to the uncertainty of the rate of disenrollment or forgone enrollment in public benefits programs, DHS recognizes that estimates provided could be an underestimate or, in some cases, an overestimate."). Second, although the Rule expressly threatens to penalize intending immigrants for the use of "any and all" means-tested benefits, 91 Fed. Reg. at 45387, 45411, 45413, 45437-38, Defendant's analysis is limited to a discrete set of particular benefits programs and does not account for the chilling effect of the Rule on any other means-tested benefits.

165. Third, Defendants' estimates of reduced benefits participation do not appear to fully capture the impact on benefits use by children, including children who are U.S. citizens. Because recent legislation has further reduced noncitizen eligibility for SNAP, the largest impact of the Rule on reduction in SNAP participation will likely fall on the U.S. citizen children that receive SNAPin immigrant families.[62]

166. Fourth, Defendants do not consider the impact of the Rule's change in the treatment of benefits receipt by non-citizens who are exempt from public charge. Under the 2019 and 2022 Rules, categories of immigrants who were exempt from public charge (mostly humanitarian immigrants such as refugees and asylees) were advised that their receipt of countable benefits while in an exempt status would not count if they were eventually to adjust through a family member. Under the Rule, however, benefits they received while in an exempt status will now be given weight in a public charge determination. This will predictably lead to an increase in refugees and asylees and other non-citizens in categories exempt from public charge deciding to forgo benefits (and having their children forgo them) to avoid this risk

167. Finally, the Rule and Guidance do not acknowledge the increase in family separation that will be caused by the new policies. More intending immigrants facing a public charge assessment will be found inadmissible on public charge grounds, a percentage that has historically hovered at less than one percent. *See* s*upra* ¶ 43. An increase in those who have their applications for adjustment denied, will, in turn, mean an increase in family separation because the

[62] Defendants' initial failure to include children's use of Medicaid and WIC in the NPRM's analysis of transfer payment reductions was pointed out by various commentators, and resulted in children's use of Medicaid and WIC being included in the final Rule's analysis. *See, e.g.,* Comment on NPRM, Georgetown University Health Policy Institute Center for Children and Families at 14 (Dec. 19, 2026), https://ccf.georgetown.edu/wp-content/uploads/2025/12/FINAL-CCF-Comments-on-Public-Charge-NPRM-2025.pdf (concluding that the "cost-benefit analysis in the NPRM is flawed, grossly underestimating the true impact of the NPRM on Medicaid/CHIP enrollment and ignoring its impact on the health of U.S. children").

applicants may no longer be able to remain in the United States and will lose the right to petition to have family members join them here. Indeed, under the current enforcement regime, a failed LPR application renders the intending immigrant an immigration enforcement priority for removal.[63]

168. Recent studies of the likely impact of the Rule further illustrate the magnitude of harms it will have on communities. For instance, in July 2026, New York City's Office of Health and Mental Hygiene concluded after detailed analysis that the Rule will result in loss of less access to primary care and increased premature mortality among immigrants in New York City.[64] A July 2026 study by the Kaiser Family Foundation finds that that 13.5 million Medicaid or CHIP enrollees live in a household with at least one non-citizen, including 5.6 million U.S. children who will be at risk of disenrollment, assuming a disenrollment rate of 10-30 percent.[65] Based on this analysis, 1.4 million to 4.1 million people will lose coverage, including 560,000 to 1.7 million citizen children.[66] The study also finds that an additional 1.7 million eligible but uninsured people in noncitizen household – over 600,000 citizen children among them – could also forgo enrolling in Medicaid or CHIP.[67] The study concludes that greater numbers of children will disenroll or forgo from Medicaid and CHIP than predicted by Defendants whose models indicate that 626,360

---

[63] Policy Memorandum: Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Deportable Aliens, USCIS (Feb. 28, 2025), https://www.uscis.gov/sites/default/files/document/policy-alerts/NTA_Policy_FINAL_2.28.25_FINAL.pdf; *see also* Exec. Order No. 14159, Protecting The American People Against Invasion, 90 Fed. Reg. 8443 at § 4 (Jan. 20, 2025); Acting Deputy Att'y Gen. Emil Bove Memorandum, *Interim Policy Changes Regarding Charging, Sentencing, and Immigration Enforcement* (Jan. 21, 2025), https://static.politico.com/66/35/5a5563a1441faa1680058a5a3d1b/memorandum-from-the-acting-deputy-attorney-general-01-21-2025.pdf.

[64] Kaveri Nadhamuni, et al., *The 2026 Public Charge Rule and Long-term Health Impacts among NYC Immigrants: a Simulation Study*, N.Y. City Dep't of Health and Mental Hygiene, (Jul. 27 2026), available at https://www.medrxiv.org/content/10.64898/2026.07.23.26358686v1.full.pdf.

[65] Samantha Artiga, et al., *Potential "Chilling Effects" of Public Charge and Other Immigration Policies on Medicaid and CHIP Enrollment*, Kasier Family Foundation (updated July 20, 2026), https://www.kff.org/medicaid/potential-chilling-effects-of-public-charge-and-other-immigration-policies-on-medicaid-and-chip-enrollment/.

[66] *Id.*

[67] *Id.*

persons will disenroll or forgo Medicaid, and 58,747 will disenroll or forgo CHIP. *See* 91 Fed. Reg. at 45467. The projected loss of health insurance for so many people, including children, will make the downstream effects conceded by Defendants even worse.

**B. The Rule and Guidance Will Harm Plaintiffs.**

169. All of these harms, many of which Defendants acknowledge, will cause irreparable harm to Plaintiffs—membership and advocacy organizations serving noncitizens, and organizations that provide nutrition support and health care to citizens and non-citizens alike.

**Make the Road New York ("MRNY")**

170. MRNY is a membership organization of over 29,000 members that builds the power of immigrant and working-class communities to achieve dignity and justice. MRNY integrates four core methodologies: community organizing, policy innovation, transformative education, and the provision of legal and community services. MRNY's principal place of business is in Brooklyn, New York. It has offices in Bushwick, Brooklyn; Corona, Queens; Port Richmond, Staten Island; Brentwood, Long Island; and White Plains, NY.

171. Approximately 95 percent of MRNY's members identify as Latinx, including those who identify as Latinx and something else.

172. MRNY has 149 full-time and 19 part-time employees.

173. MRNY provides programs and services that are regularly used by immigrants and their families, including direct legal services, health access programs, adult literacy programs, and youth and school programs.

174. MRNY provides direct legal services through its legal department, which is divided into three practice areas: Immigration, Employment and Workplace Justice, and Housing. MRNY's legal program benefits up to 25,000 individuals annually, ensuring that families avoid unlawful eviction, recover stolen wages, fight workplace discrimination, and prevent family separation.

175. MRNY operates a health access program that reaches 15,000 low-income immigrant New Yorkers each year. The health access program provides SNAP enrollment assistance, health navigation services, health insurance enrollment assistance, and home visits for families dealing with chronic health issues. The health access program also holds a weekly food pantry at MRNY's offices in Brooklyn and Queens and also distributes food on a monthly basis in Staten Island, Long Island, and Westchester.

176. MRNY's adult literacy program supports approximately 490 community members annually to learn English, study for their citizenship tests and train to become Community Health Workers.

177. MRNY also runs youth and school programs that reach 3,000 working class immigrant youth and youth of color a year with innovative peer-led college access support, creative arts and media programs, and youth-focused political education.

178. Each of these programs are funded by a combination of government, foundation, and charitable grants and contracts. Fifty-five percent of MRNY's funding comes from government sources at the city and state level. MRNY is a primary contract holder for several large multi-year government grants. All of MRNY's government grants, particularly the large multi-year contracts, require MRNY to meet a minimum case deliverable number. Twenty-six percent of MRNY's funding comes from foundations, including both general operating support and program-specific grants. Fifteen percent of MRNY's funding comes from individual donors, and four percent comes from miscellaneous sources.

179. Most grants, whether from the government or foundations, are tied to specific services and/or populations, and MRNY cannot shift funding received from one grant to other needs.

180. MRNY's predictions about the impact of the Rule and Guidance are informed by its experience with the 2019 Rule. While the 2019 Rule was in effect, MRNY staff witnessed the chilling effect, fear, and confusion that it engendered firsthand. MRNY expended substantial resources to combat the chilling effects caused by the 2019 Rule, including in the form of training, outreach, and the creation of Know Your Rights ("KYR") materials, and was a plaintiff in a lawsuit that obtained a preliminary injunction against the 2019 Rule.

181. MRNY submitted a comment to the NPRM.[68]

182. The Rule and Guidance will harm MRNY in four main ways.

183. First, the Rule and Guidance will significantly and negatively impact MRNY's continued funding streams.

184. The Rule and Guidance create a risk that MRNY will be unable to meet case deliverables set by government contracts and makes satisfying these deliverables considerably more difficult.

185. For instance, MRNY's health access work, such as benefits enrollment, health navigation, and health insurance enrollment, is supported by multiple city and state grants that require certain deliverables. For example, one particular grant requires MRNY to provide close to 200 enrollments per month, among other deliverables. The chilling effect created by the Rule will cause a substantial number of community members to decline to enroll or renew their health insurance or other benefits—even for their U.S.-citizen children—out of fear that they could be deemed a public charge in the future. This could impair MRNY's ability to meet the 192-enrollment target each month.

[68] Make the Road New York, Comment on NPRM (Dec. 19, 2025), https://www.regulations.gov/comment/USCIS-2025-0304-5327.

186. MRNY is already seeing this dynamic. Since Defendants announced the Rule, MRNY staff have witnessed the Rule's chilling effect on a daily basis. Many clients have asked whether they should disenroll themselves or their U.S.-citizen children from benefits. Most of the clients who have asked about disenrolling are not directly impacted by the Rule and Guidance because they are either already citizens or LPRs, have already applied for adjustment of status, or are in an exempt category. For example, a mother of a U.S.-citizen child with a disability who depends on Medicaid to access essential medical care asked whether she should terminate her child's Medicaid coverage because she feared becoming a public charge and being separated from her child. As another example, a guardian caring for a child with Special Immigrant Juvenile Status, an exempt category, similarly questioned whether the child's Medicaid coverage could place the guardian at risk. Parents of U.S.-citizen children are even asking whether it is safe for their children to participate in programs such as free school meals and summer SNAP.

187. The Rule and Guidance may also negatively impact MRNY's foundation funding, which supports a significant portion of MRNY's services work, such as health navigation and benefits enrollment. Most of MRNY's foundation funding is project-specific and requires MRNY to provide a specific service to a specific population. For instance, MRNY has several grants that support benefits enrollment for eligible low-income immigrants. As described above, the chilling effect created by the Rule and Guidance will dissuade this population from enrolling in or renewing benefits and will make counseling clients regarding benefits considerably more difficult, jeopardizing MRNY's ability to maintain these grants.

188. Second, the Rule and Guidance will impair MRNY's operations and force it to change its practices, at substantial cost.

189. Due to both the greatly expanded list of relevant benefits contemplated by the Rule and Guidance and to the chilling effect, advocates will also need to spend significantly more time helping individuals apply for benefits and answering their questions. MRNY staff are already spending more time educating clients about what public charge is, who it impacts, what benefits are considered as part of the Rule and Guidance, and what the use of benefits by dependents, including U.S. citizen children, means under the Rule and Guidance. MRNY staff must spend additional time answering questions about the Rule and Guidance even if the issue is not directly relevant to the services the client is seeking. Further, these conversations happen not only when clients seek advice about benefit enrollment or immigration legal services, but also at other times, when clients visit MRNY's food pantry or meet with MRNY's outreach team in the community.

190. For clients seeking assistance with benefits enrollment, MRNY staff will need to spend additional time assessing clients' risk of public charge and advising them about their options. As part of the standard benefits screening to determine eligibility for benefits, MRNY staff will now also need to see if the client is planning to adjust status in the near future. When a public charge risk is identified, the client will be referred to the legal immigration team for a consult and the benefits advocate and immigration attorney will discuss their options, including the risk and benefits of enrolling in each type of benefit.

191. Previously, MRNY benefits staff could easily counsel a client about the limited types of benefits that would impact a public charge determination and help them enroll in benefits during a single consultation. Under the Rule and Guidance, the process will now require more time for consultations between the client and the benefits advocate, who will require additional support from the immigration legal team to understand how the Rule and Guidance affect the application process.

192. Third, the Rule and the Guidance will also impact MRNY's ability to meet the needs of members at its food pantries. The food pantry is a critical service that MRNY provides as part of its mission to protect and advance the dignity of its members. It ensures that individuals and families, including members who work in low-wage jobs and cannot afford the growing price of food—have access to nutritious meals. Even those who have SNAP may need assistance at the end of the month, because SNAP levels are often not enough to feed a family. But demand for MRNY's food pantry services is already rising because non-citizens who used to be eligible for SNAP have been cut off under H.R. 1. The chilling effect caused by the Rule will make the demand for MRNY's food pantry even greater—and jeopardize its ability to meet that need . MRNY's food pantries are able to supply food at their pantries though a line of credit funded by various non-profits and through government contracts as well as through donations from two major non-profits. Likewise, the food distribution programs in Staten Island, Westchester and Long Island receive food donations from the Hispanic Federation. MRNY's food pantries are already at capacity. For example, in Queens, individuals can only come to the pantry once a month, and in Brooklyn twice per month. With demand already so high, the end-result will be more members left without access to food.

193. Fourth, MRNY's immigration and housing legal practices will also be impacted by the Rule and Guidance. In the immigration practice, MRNY expects more of their adjustment of status clients to be impacted by the Rule and Guidance. As a result, preparing their applications will take more time. Each application will require MRNY staff to collect and review documentation of current and past benefits use, and these steps will be more complex and time consuming given the expanded list of benefits at issue. The additional time required for preparing each application will either mean that MRNY staff will need to spend considerably more time

assisting clients with the adjustment process or that MRNY staff will need to expend more resources to process them in the same amount of time.

194. The Rule and Guidance, once explained to applicants, may also cause people whom the legal team advises to ultimately decide not to file an application. This would result in the expenditure of staff time not tied to any grant deliverable and further strain staff resources.

195. Further, because the Rule and Guidance are likely to increase denials of adjustment on public charge grounds, MRNY immigration legal staff will face an increased need from clients who are placed in removal proceeding after their application to adjust status is denied by USCIS or who may want to consider administrative appeals of their denials. MRNY will be required to allocate additional resources to meet this need.

196. MRNY's housing practice will also be negatively impacted by the Rule and Guidance. MRNY anticipates that the Rule and Guidance will cause more housing clients to be deterred from seeking assistance from state and local social services agencies to resolve rental arrears or support ongoing housing expenses through housing subsidies that would be subject to consideration under the new Rule and Guidance. This will impact MRNY's ability to resolve eviction cases successfully, with a resulting increase in the amount of time that staff may need to resolve housing matters. This would frustrate MRNY's ability to meet its grant deliverables and fund its housing work.

**New York Legal Assistance Group ("NYLAG")**

197. NYLAG is a nonprofit, civil legal services organization combatting economic, racial, and social justice by advocating for people experiencing poverty or in crisis. NYLAG operates over 150 community sites across New York State. NYLAG addresses emerging and urgent legal needs with comprehensive, free legal services, financial counseling, impact litigation, policy advocacy, and community education. Across approximately 20 different programs and

practice areas, NYLAG serves immigrants, seniors, the homebound, families facing foreclosure, renters facing eviction, low-income consumers, those in need of government assistance, children in need of special education, domestic violence victims, persons with disabilities, patients with chronic illness or disease, low-wage workers, low-income members of LGBTQ communities, Holocaust survivors, and veterans, as well as others in need of free legal services.

198. In 2025, NYLAG positively impacted the lives of nearly 129,000 individuals. Over 50,000 of those individuals were non-citizens.

199. NYLAG submitted a comment to the NPRM.[69]

200. Many NYLAG programs will be significantly burdened by the Rule and Guidance.

201. One of the NYLAG programs that will be most severely impeded is LegalHealth, a medical-legal partnership.

202. LegalHealth has been operating for 25 years and is the nation's largest medical-legal partnership. LegalHealth's mission is to improve health equity by addressing the social determinants of health through the law. LegalHealth accomplishes its mission by providing free legal services onsite for patients of 38 hospitals and health care organizations in New York City, Westchester, and Long Island. LegalHealth attorneys work as part of a patient's healthcare team, providing legal care through representation in immigration, housing, public benefits, and other legal matters.

203. Many of LegalHealth's clients are noncitizens or have at least one noncitizen member in their household. In 2025, LegalHealth served approximately 8,800 individuals on 9,660

[69] New York Legal Assistance Group, Comment on NPRM (Dec. 19, 2025), https://www.regulations.gov/comment/USCIS-2025-0304-5159.

legal matters. Those legal matters included immigration matters (46 percent), benefits matters (20 percent), and housing matters (15 percent).

204. LegalHealth's practice is based on the recognition that the social determinants of health are closely tied to the law and often must be addressed through legal action. LegalHealth staff are generalists who deliver legal services holistically on a variety of legal matters. Health outcomes for clients and their households improve when the households' resources are maximized through means-tested benefits that defray their expenses, when clients obtain access to health insurance, when they have stable housing and safe living environments, and when their children receive free appropriate education.

205. LegalHealth staff assisting clients seek to understand the needs of the whole client and their household. For example, LegalHealth attorneys ask about clients' household composition, income, health insurance, and housing type. This allows LegalHealth attorneys to provide comprehensive legal advice that is not limited to a single legal issue.

206. For example, a doctor may refer an individual with a cancer diagnosis to LegalHealth for advice specifically about eviction that the client was facing because of lost income. LegalHealth staff would conduct a complete intake and provide advice not only about eviction, but about whether the client or a family member can access benefits such as SNAP, rental assistance, disability benefits, child support, or other income supports while the client completes their treatment before returning to work.

207. LegalHealth regularly advises its clients on a range of legal issues that affect positive health outcomes. A primary area in which LegalHealth advises its clients is their eligibility for a wide array of public benefits and on resolving obstacles to enrollment that may be preventing them from receiving benefits for which they areeligible. These benefits include, without limitation,

SNAP, public assistance, Medicaid and other medical insurance programs, disability benefits, and housing benefits, among others. LegalHealth's public benefits work accounts for a substantial portion of its time and resources.

208. As part of its public benefits advising, LegalHealth helps non-citizen clients determine whether they are eligible for Medicaid and other health insurance programs that may cover the cost of needed health care, including lifesaving medical treatments and important preventative care.

209. LegalHealth also provides immigration advice to clients who are non-citizens or have non-citizens in their families or households. LegalHealth's immigration work aims to help its clients achieve the highest legal immigration status for which they are eligible. As part of this practice, LegalHealth attorneys routinely assist clients in applying for family-based adjustment of status, as well as assisting with a variety of applications for humanitarian forms of relief, citizenship, and work authorization.

210. LegalHealth advises on additional legal issues as well. For example, LegalHealth counsels clients on obtaining judicial orders compelling repairs to mold, infestations, and other housing defects that cause and exacerbate health conditions.

211. LegalHealth also trains healthcare providers on the power of the law to address social determinants of health and how to make referrals to our services which are embedded in the hospital. Generally, LegalHealth trains health care providers at its partners twice per year.

212. The Rule and Guidance will severely impede LegalHealth and thereby also NYLAG's operations.

213. One area of LegalHealth's operations that will be significantly affected is the work LegalHealth does related to government benefits.

214. Clients who are non-citizens, or have non-citizens in their households, will have new questions, doubts, and fears related to the immigration consequences for themselves and their family members of enrolling in federal or state Medicaid or other public benefits. The Rule and Guidance raise the stakes for non-citizen clients who receive or need government benefits like Medicaid. If they are planning to adjust to LPR status through a family member, they will face a public charge test, and the receipt of government benefits for themselves or their children could affect their ability to obtain a green card and remain in the U.S. long-term together with their family members. Other clients may be seeking to obtain or already have a status that is exempt from public charge. These clients will still need counseling because the Rule and Guidance provide that any means-tested benefit they receive while exempt could count against them if they face a public charge test in the future. Additional clients may plan to serve as a sponsor but need Medicaid to get through a health crisis and need advice on whether receiving Medicaid now will jeopardize their ability to serve as a sponsor in the future. Still other clients may not have a path to obtaining LPR status through a family member, but their circumstances may change in the future – for example, if a child becomes eligible to sponsor them or the client subsequently gets married to a U.S. citizen.

215. LegalHealth's work will also be affected by the varied impacts of the Rule and Guidance on non-citizens. First, LegalHealth will see increased demand for benefits consultations. The Rule and Guidance will predictably cause immigrant families to question whether to enroll in or disenroll from benefits. Under the medical-legal partnership framework, healthcare providers will refer those patients for legal consultation before making disenrollment decisions. As a result, LegalHealth's health provider partners will likely refer more patients to LegalHealth for public benefits assistance.

216. Second, a greater portion of LegalHealth's time and resources will be devoted to advising clients on benefits issues relating to the Rule and Guidance. The stakes are very high for the clients described above. Advising them about issues like the immigration consequences of receiving benefits under the Rule and Guidance, the mechanics of disenrolling from benefits, and the impact on their health and treatment options is complex. Depending on the complexity of the client's situation, a benefits specialist may need to involve an immigration specialist as well.

217. Prior to the Rule and Guidance, LegalHealth's public benefits consultations primarily focused on whether a client is legally eligible for a benefit and on overcoming obstacles to enrollment. LegalHealth has been able to answer questions about whether benefit enrollment would result in a public charge determination quickly and easily, without a significant expenditure of LegalHealth attorneys' time or resources.

218. Under the new Rule and Guidance, however, LegalHealth attorneys will need to advise clients not only about the client's eligibility for benefits, but – where the client or one of the client's family members is a non-citizen – also about whether enrollment will have collateral consequences on the client's or a family member's immigration status and options. This additional advice will require LegalHealth attorneys to spend additional hours counseling clients and their family members. LegalHealth estimates that, under the Rule and Guidance, public benefits cases where the client or one of the client's family members is a non-citizen will, on average, require at least double the amount of work compared to prior similar representations.

219. Third, where clients decide to disenroll themselves or their children from public benefits because of the immigration consequences of receiving benefits under the Rule and Guidance, clients will face increased financial pressures. This will increase other stressors which

for many clients will create new health and legal issues, prompting additional complex referrals by healthcare providers to LegalHealth.

220. For example, if a client elects to forgo housing benefits in order to avoid a public charge determination, the client may be evicted or may be forced to downgrade to substandard housing with poor housing conditions, either of which would exacerbate negative health conditions. The client will need representation in housing matters, including, for example, eviction proceedings or housing-conditions litigation. As LegalHealth attorneys spend more time addressing the cascading consequences of benefits disenrollment, they will likely be unable to provide their clients with the comprehensive advice and representation required to address their health needs.

221. The combined impact of the increased demand and the additional time necessary to consult with clients means that LegalHealth will likely be unable to be provide the same level of comprehensive public benefits service that it has historically provided. In other words, LegalHealth will either be unable to successfully assist as many clients in obtaining the benefits for which they are eligible, or NYLAG will be forced to expend additional resources to provide the same volume and quality of representation. These burdens will have particularly dire consequences for LegalHealth's clients, many of whom come to NYLAG in the midst of a health crisis, and will specifically frustrate LegalHealth's mission to mitigate the social determinants of health using the power of the law.

222. Another likely consequence will be an ever-growing case backlog and longer wait times for clients to receive LegalHealth's services. This backlog will impede LegalHealth's core mission of helping its clients obtain health benefits in a timely manner. Its clients will go longer

without insurance and other benefits, unless NYLAG is able to expend additional resources to ensure LegalHealth can continue providing the current volume and quality of representation.

223. Like its public benefits practice, LegalHealth's immigration practice is likely to be severely impeded by the new Rule and Guidance. LegalHealth attorneys will now need to expend significantly more time and effort representing its clients on their Form I-485 applications for adjustment to legal permanent resident status, including by counseling the client, developing the facts necessary for the application, and preparing the application. Because the receipt of any means-tested public benefit by the individual or their household members may now be considered adversely in an adjustment-of-status adjudication, LegalHealth attorneys will be required to collect information about every public benefit accessed by the client or their household members, including U.S. citizen children. Moreover, its staff will need to assist the client in gathering documentation to accurately represent the public benefits that they have received and to list all such benefits on the new version of the Form I-485, which mandates disclosure of this information. LegalHealth attorneys estimate that collecting, verifying, and documenting a client's benefits usage will likely require at least four to five additional hours of work per adjustment of status case.

224. LegalHealth attorneys will also need to provide those clients legal advice on how and whether the use of benefits is likely to affect the success of their adjustment-of-status application, and what legal options may be available to the client should their adjustment-of-status application be denied. Providing this legal counsel is likely to require a significant amount of additional time and resources by LegalHealth attorneys and staff.

225. By way of example, one recent client who is battling cancer sought to pursue adjustment of status through her adult son. In the face of the Rule and Guidance, however, the

attorney flagged concerns about her minor children's receipt of SNAP benefits. Rather than proceed with the family-based adjustment of status, the LegalHealth attorney and client are exploring potential humanitarian relief available to the client, which is more labor-intensive and time-consuming, less certain, and will impose additional stress on the client as she weighs her options to prioritize her health and her children's wellbeing.

226. As a consequence, LegalHealth will need to take on fewer adjustment-of-status cases or expend additional resources to maintain the current volume and quality of adjustment-of-status representation.

227. None of the additional work outlined above, including the comprehensive collection and documentation of a client's benefits usage and counseling on the effects of benefits usage on clients' immigration status, was required under the 2022 Rule.

228. Additionally, in line with LegalHealth's mission and practice, they will need to increase its trainings at its 38 healthcare partners so that the healthcare staff receive education on the Rule and Guidance, the Rule's applicability, and the importance of referring the partners' patients to LegalHealth when those patients express concerns about enrolling in benefits or that they intend to disenroll in benefits. This will put a further strain on NYLAG and LegalHealth's resources and ability to represent clients.

229. The burdens that the Rule and Guidance will cause LegalHealth to experience will likewise burden other NYLAG direct services practices, and NYLAG as an institution. Those effects will significantly impede NYLAG's mission to serve New Yorkers experiencing poverty or in crises.

230. Among the other NYLAG units that will be burdened by the Rule and Guidance are NYLAG's Public Benefits Unit, Immigrant Protection Unit, and Tenants' Rights Unit without limitation.

231. NYLAG's Public Benefits Unit helps individuals, children, and families the benefits to which they are entitled, including but not limited to: accessing and maintaining benefits, including Medicaid, Medicare, Public Assistance, and SNAP; challenging wrongful denial, reduction, or termination of benefits; preparing medical and financial advance planning documents; advocating for homecare for the elderly and those with disabilities to allow them to live safely in their own homes; navigating access to shelters for people without homes; ensuring that individuals with disabilities receive benefits to gain access to housing, lost income, food, and health care; helping veterans secure benefits connected to their service; working with immigrants to ensure access to health care, food, and housing; and helping to build food security through obtaining nutritional assistance.

232. NYLAG's Immigrant Protection Unit defends people facing deportation, fights for those seeking asylum and other humanitarian relief, helps clients apply for green cards through family-based petitions, works with survivors of intimate partner violence and other crimes to secure immigration status, and helps clients apply for citizenship.

233. NYLAG's Tenants' Rights Unit fights to preserve housing, prevent homelessness, ensure economic security for families, and promote stability in our communities. Its services include representing individuals and families in housing court and eviction cases, advocating before administrative agencies, and obtaining and preserving rent subsidies.

234. NYLAG's Public Benefits Unit, Immigrant Protection Unit, and Tenants' Rights Unit, along with other NYLAG programs, will face burdens on their operations similar to the burdens on LegalHealth. Specifically, without limitation:

235. These units will face increased demand for legal advice on the effect of the Rule and Guidance.

236. These units will need to expend additional time and resources advising each client about the effect of the Rule and Guidance on that client's decision whether to enroll in or disenroll from the wide array of public benefits on which these units provide legal consultation and representation.

237. These units will need to expend additional time and resources providing more complex immigration advice to clients who may be affected, or fear they will be affected, by the Rule and Guidance, or ensuring that the client receives such immigration advice from other sources.

238. As a result, each of these units, and NYLAG as a whole, will be required either to represent and advise fewer clients, or be forced to expend additional resources to provide the current volume and quality of representation.

**Association to Benefit Children (ABC)**

239. ABC is a nonprofit children's services organization founded in 1986. For forty years, ABC has been a champion for children. ABC's mission is to offer every child a joyful, beloved life by creating compassionate programs in urgent response to the needs of New York City's most vulnerable families. ABC's vision is for all children to have a healthy, safe life full of joy, learning, and love in a nurturing family. ABC is committed to serving the whole child and, accordingly, the whole family and the whole community. ABC provides wide-ranging

programming in early childhood education, youth development, children's mental health treatment, family preservation, community outreach, and supportive housing.

240. ABC operates primarily in East Harlem and the South Bronx. These communities have high rates of uninsured children, infant mortality, and babies with low birth weight.

241. ABC serves all children and the whole community, irrespective of citizenship or immigration status. The communities that ABC serves have a substantial number of immigrant households. For example, census data between 2019 and 2023 show that 30.6 percent of South Bronx residents and 24.6 percent of East Harlem residents were born outside of the United States,[70] and many foreign-born residents of these communities have U.S.-citizen children.

242. Among other programs, ABC provides mental health care services to children and operates a Head Start early childhood education program.

243. Children participating in ABC's programs frequently receive public benefits, such as SNAP and WIC, which provide support for their health and well-being.

244. ABC operates a mental health program for children called "Fast Break," which includes both stand-alone and school-based mental health clinics; a community-based mental health program, where licensed clinicians meet with children in their homes or a public place in their community (called Fast Break Plus); and a crisis team that provides an immediate response to children's mental health crises.

245. ABC's mental health clinics employ 87 full- and part-time staff members, nine managers, 30 paraprofessionals (such as Program Associates and Peer/Parent Advocates), and 48

[70] NYC Planning, *The Newest New Yorkers, 2026*, ch. 3, tables 3.5 & 3.13, https://www.nyc.gov/assets/planning/newest-new-yorkers-2026/.

clinicians. The mental health program also contracts with 30 clinicians who work as independent contractors.

246. ABC's 15 school-based clinics serve 26 public schools in Manhattan and the Bronx. These clinics provide crisis intervention and treatment for children as well as training for educators and parents on how to recognize and respond appropriately to the mental health needs of children and young adults. The clinics provide full-day, year-round services. The school-based clinics serve 223 children annually, 89 percent of whom have Medicaid.

247. ABC's three stand-alone mental health clinics, one in the South Bronx and two in East Harlem, serve 761 children annually, 99 percent of whom have Medicaid.

248. Fast Break Plus, ABC's community-based mental health services program, connects children with services in their homes and communities, outside the traditional outpatient treatment setting.

249. All of ABC's mental health clinics offer children a range of mental health services, including a wide variety of therapies and treatments, psychiatric assessments, and medication management. Medicaid payments for services are essential to ABC's Fast Break Clinics' funding and operations.

250. ABC Children's Mobile Crisis Team provides rapid crisis intervention to children and young adults anywhere in Manhattan via the citywide "988" hotline. In addition to immediately responding to and deescalating crisis situations, the Mobile Crisis Team conducts mental health and safety assessments and meets with children after the crisis to provide follow-up care. An important part of the services that the Mobile Crisis Team offers is to connect young people and caretakers to ongoing care for long-term support. The Mobile Crisis Team serves 400 children annually, 75 percent of whom have Medicaid.

251. When children served by the Mobile Crisis Team are not enrolled in health insurance, ABC works to connect them with Medicaid or other programs for which they may qualify. When ABC cannot find an appropriate insurance program for uninsured children, it becomes nearly impossible to connect children served by the Mobile Crisis Team with long-term care. Often, ABC has to instead refer such uninsured children to hospital emergency rooms for ongoing care.

252. Some children that ABC serves through its school-based and stand-alone mental health clinics require mental health services that ABC cannot provide, such as inpatient treatment or other more intensive services, or otherwise require a referral to another health care provider for ongoing care. Because it is extremely difficult to find the right care for uninsured children, ABC also works with uninsured children in these settings to find them health insurance.

253. Another key aspect of ABC's work is providing early childhood education programming. Along with other education programming, ABC has been a Head Start provider for approximately 30 years. Head Start is a federal program that "prepare[s] America's most vulnerable young children to succeed in school and in life beyond school."[71] "Head Start programs deliver services to children and families in core areas of early learning, health, and family well-being while engaging parents as partners every step of the way."[72]

254. Close to 500 children (ages 0–5) and their parents currently participate in ABC's Head Start program across four centers.

255. All participants in ABC's Head Start program must be eligible for and enroll in the federal Head Start program, which funds ABC through a contract. The contract requires that ABC

---

[71] HeadStart.gov, *Head Start Programs*, https://headstart.gov/programs/article/head-start-programs.

[72] *Id.*

meet specific enrollment and attendance metrics. ABC must regularly report on its performance to Head Start. If ABC did not meet the performance metrics set in the contract, it would be sanctioned and would be required to engage in a lengthy and time-intensive process to take corrective action. Corrective action entails the preparation of regular reports documenting efforts to recruit eligible children, and regular monitoring of these efforts by oversight agency personnel, along with oversight agency personnel meetings with staff and board members. The chilling effect created by the Rule and Guidance will also likely lead to reduced enrollment. As a result, ABC will need to expend significant effort and resources to identify and recruit families, as ABC would need to convince families in a heavily immigrant community to overcome their fears and enroll their children in Head Start.

256. ABC's Early Head Start program provides services to expectant parents starting in the third trimester of pregnancy. ABC provides programming on attachment, prenatal health, group socialization, and other topics. After birth, ABC continues to provide services to children and families focused on developmental growth through play.

257. ABC's Early Head Start (for ages 0–3) and Head Start (for ages 3–5) programs consist of two birth to one-year old classrooms, five one- to two-year-old classrooms, seven two- to three-year old classrooms, and twelve three- to five-year old classrooms.

258. ABC employs 144 full- and part-time staff members in the schools that operate Head Start. Of these, 97 are directly allocated to Head Start, meaning that their work either directly impacts Head Start programming and/or they are being funded by Head Start federal funds. Of the 97 staff members, 15 hold managerial or clerical roles, 10 are Family Workers or hold similar positions, seven provide health-related services (such as nurses or therapists), and 65 are classroom/teaching staff.

259. ABC's Early Head Start home-based program provides comprehensive services to expectant families and families with children from birth to age three. The home-based program supports parents by building their capacity to strengthen their child's physical, social, emotional, and intellectual development. It also builds community by providing opportunities for parents to engage with each other. The home-based program serves 45 families with infants or toddlers at any point in time.

260. ABC's Head Start program also offers preschool integrated co-teaching classrooms for children aged three to four. In these classrooms, children have opportunities to learn from and lead their peers. Service providers, including speech, physical, and occupational therapists as well as counselors are on site to provide services in accordance with each child's Individualized Education Program.

261. ABC's Graham School in Echo Park, has Head Start and Early Head Start programs. For Early Head Start, ABC has one birth to one-year-old classroom, three classrooms for one- to two-year-olds, and three classrooms for two- to three-year-olds, and for Head Start, ABC has five classrooms, three of which are three integrated co-teaching classrooms.

262. At Cassidy's Place in Yorkville, for Early Head Start, ABC has one classroom for one-year-olds and two classrooms for two-year olds. It also has seven classrooms for children aged three to five, where it provides preschool special education services blended with Head Start and New York City's universal Pre-K program.

263. In addition, ABC offers four classrooms for one- and two-year-old children with special needs at its two other Early Head Start sites--Cody House and The Keith Haring School.

264. When children participating in ABC's Head Start programs have health care needs that cannot be met on site, ABC works to refer and connect them to outside health care providers.

As with mental health care services, this is extremely difficult if the child does not have health insurance. Currently, 90 percent of ABC's Head Start participants have Medicaid.

265. The Rule and the Guidance significantly harm ABC in two primary ways.

266. First, ABC is a children's mental health care provider that relies almost exclusively on Medicaid payments for its services. Given that ABC primarily serves the South Bronx and East Harlem, communities with substantial percentages of households with immigrants, the chilling effect caused by the Rule and Guidance will result in some of its children patients disenrolling or forgoing enrollment in Medicaid and other public health insurance programs. This will decrease ABC's revenue and make it more difficult for ABC to continue providing the mental health care services described above.

267. Second, because the Rule defines supplemental benefits such as Head Start as means-tested benefits, the Rule's chilling effect will cause participants in ABC's Head Start program to disenroll, meaning that ABC will no longer be able to serve these children and families. If ABC does not meet the enrollment and attendance metrics set by its Head Start contract, it will need to spend meaningfully more time and effort to take the corrective actions required by its contract. The chilling effect will also significantly shrink the pool of interested families that ABC can recruit to join its programs, as families in the heavily immigrant communities it serves will be afraid of enrolling in any means-tested program, even if they are not subject to public charge. Thus, ABC will be required to expend significantly more time and resources on recruitment to fulfill its contract obligations.

**African Communities Together (ACT)**

268. ACT is a national nonprofit membership organization of African immigrants fighting for civil rights, economic opportunity, and a better life for more than two million African immigrants and their families residing in the United States. ACT serves thousands of members

across its chapters in New York, Virginia, Maryland, Pennsylvania, and the District of Columbia, by providing legal assistance to members and clients on immigration matters and advice to members and clients who need access government benefits; organizing members around legal policy issues affecting African immigrants; and facilitating a national network of African leaders and African immigrant-serving organizations. Its staff consists of 31 lawyers, organizers, advocates, and support staff. Among ACT's members are residents of Maryland, Virginia, Pennsylvania, Washington, D.C., and New York City applying for and/or planning to apply for adjustment of status. ACT's principal place of business is located in New York, New York.

269. ACT sues on behalf of its members. At least one identified ACT member, Member A, will be imminently subject to the challenged policy when she files her Form I-485 application after September 18, 2026 and will suffer harm that is traceable to the Rule and Guidance that would be redressed by vacatur and injunctive relief. The claims and requested equitable relief do not require individualized proof or participation by members.

270. In addition to providing legal services to intending immigrants and LPR and citizen members petitioning on behalf of their parents, spouses, siblings, and children, ACT serves members and clients seeking legal assistance with other forms of immigration relief, including applications for asylum, U-Visas and T-Visas, Temporary Protected Status, Employment Authorization Documents, and renewals for lawful permanent residence. ACT also engages in national advocacy and community "Know Your Rights" education, seeking to advance opportunities for permanent status for African immigrants.

271. ACT's clients include individuals who receive Medicaid, Supplemental Nutrition Assistance Program, and other public benefit programs for which they and/or their children are

eligible. ACT provides education to community members on public benefits programs, including on eligibility.

272. ACT also provides immigration legal information online, through video and audio recordings, infographics, “explainer” articles and similar resources that are distributed through its website, email lists, ethnic media, social media channels, and—most frequently—are forwarded by community members to African immigrant associations and chats.

273. By impairing the interests ACT seeks to protect — adjustment of status for individuals, lawful adjudication, and family unity under the INA— Defendants’ Rule and Guidance substantially impede ACT’s core purpose of securing family unification, dignity, and economic opportunity for African families and communities in the United States. The Rule and Guidance have already harmed ACT and threaten ongoing and future harm to ACT.

274. ACT’s members suffer direct harm. At least one identified ACT member, Member A, will be imminently subject to the challenged policy when she files her Form I-485 application after September 18, 2026. She is a noncitizen with a lawful admission and is preparing to adjust her status through her U.S. citizen husband. Her husband is currently receiving SSI and Medicaid. He is currently disenrolling from SSI but will continue to receive Medicaid, a benefit that does not count for public charge purposes under the 2022 Rule but will count under the Rule. Member A expects to purchase health coverage under the Affordable Care Act through the Health Insurance Marketplace and may qualify for advance premium tax credits, which are subsidies that would not count under the 2022 Rule but will presumably count under the Rule.

275. Ensuring that families can stay together through family-based immigration and connecting families that need temporary government assistance while they get on their feet is especially important for ACT’s members and clients, who often start their lives in the U.S. working

low-wage jobs without private health insurance. The Rule and the Guidance affect ACT's ability to link clients with the benefits and services they need because they are in the process of adjusting and expect to face a public charge assessment and due to clients' warranted fear that receiving such benefits today will be held against them in the future when they pursue their goals of seeking LPR status or when they help a family member or loved one to do so by serving as a petitioner or a sponsor.

276. In the last two months, ACT has experienced an increased volume of questions from members about the impact of the Rule and the Guidance. For example, ACT's legal team has received questions on the significance of the Rule and Guidance and their effect on pending applications for adjustment to LPR status through a family member. ACT has had no choice but to apply its resources to address member and client concerns about the Rule and the Guidance to the detriment of its other work addressing other substantive immigration law matters for its members. This impairs ACT's ability to accomplish its objectives, which includes helping immigrant families unite and stabilize and connecting them to government services and supplemental benefits for which they are eligible.

277. ACT anticipates a need to conduct additional training and produce new resources regarding the Rule and the Guidance. ACT Legal Staff will also need to train further to prepare advocates guiding clients through the interview and questions about public charge in response to DHS's new Rule and Guidance.

278. Defendants' promulgation of the Guidance without notice and comment also harmed ACT and its members by depriving the organization and individuals of the opportunity to provide comments detailing the extensive harms created by the Guidance.

## CAUSES OF ACTION

### COUNT ONE
### Violation of the APA, 5 U.S.C. § 706—Contrary to Law and in Excess of Statutory Authority (The Rule)

279. Plaintiffs reallege and incorporate by reference the allegations of fact in each of the preceding paragraphs of this Complaint.

280. The APA, 5 U.S.C. § 706(2), provides that a reviewing court "shall hold unlawful and set aside" agency action that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

281. DHS and USCIS are each an "agency" under the APA.

282. The Rule is a "final agency action" under the APA.

283. For the reasons set forth herein, in implementing the Rule, Defendants took action that is not in accordance with law and in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, all in violation of the APA, in that the Rule (i) improperly equates "public charge" with the receipt of any and all means-tested public benefits; (ii) improperly seeks to penalize intending immigrants for the receipt of public benefits that Congress made available to them; and (iii) provides that public charge bonds may be breached solely because the bonded immigrant receives any means-tested public benefits whether or not the person is a public charge, in violation of the INA.

284. Defendants' violations of the APA have caused and will continue to cause irreparable harm to Plaintiffs and others.

**COUNT TWO**
**Violation of the APA, 5 U.S.C. § 706—Arbitrary and Capricious**
**(The Rule)**

285. Plaintiffs reallege and incorporate by reference the allegations of fact in each of the preceding paragraphs of this Complaint.

286. The APA, 5 U.S.C. § 706(2), provides that a reviewing court "shall hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion" or "without observance of procedure required by law."

287. DHS and USCIS are each an "agency" under the APA.

288. The Rule is a "final agency action" under the APA.

289. For the reasons set forth herein, in enacting the Rule, Defendants took action that is arbitrary and capricious, an abuse of discretion, and without observance of procedure required by law, all in violation of the APA, in that Defendants relied on factors not authorized by statute, failed to consider important parts of the problem, failed to account for serious reliance interests, failed to consider alternative policies, and provided a pretextual explanation for the Rule to mask impermissible racial and anti-immigrant animus.

290. Defendants' violations of the APA have caused and will continue to cause irreparable harm to Plaintiffs and others.

**COUNT THREE**
**Violation of the APA, 5 U.S.C. § 706—Contrary to Law**
**and in Excess of Statutory Authority**
**(The Guidance)**

291. Plaintiffs reallege and incorporate by reference the allegations of fact in each of the preceding paragraphs of this Complaint.

292. The APA, 5 U.S.C. § 706(2), provides that a reviewing court "shall hold unlawful and set aside" agency action that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

293. DHS and USCIS are each an "agency" under the APA.

294. The Guidance is a "final agency action" under the APA.

295. For the reasons set forth herein, in implementing the Guidance, Defendants took action that is not in accordance with law and in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, all in violation of the APA, in that the Guidance (i) improperly equates "public charge" with the receipt of any and all means-tested public benefits; (ii) improperly seeks to penalize intending immigrants for the receipt of public benefits that Congress made available to them; and (iii) provides that public charge bonds may be breached solely because the bonded immigrant receives any means-tested public benefits whether or not the person is a public charge, in violation of the INA.

296. Defendants' violations of the APA have caused and will continue to cause irreparable harm to Plaintiffs and others.

**COUNT FOUR**
**Violation of the APA, 5 U.S.C. § 706—Arbitrary and Capricious**
**(The Guidance)**

297. Plaintiffs reallege and incorporate by reference the allegations of fact in each of the preceding paragraphs of this Complaint.

298. The APA, 5 U.S.C. § 706(2), provides that a reviewing court "shall hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion" or "without observance of procedure required by law."

299. DHS and USCIS are each an "agency" under the APA.

300. The Guidance is a "final agency action" under the APA.

301. For the reasons set forth herein, in issuing the Guidance, Defendants took action that is arbitrary and capricious, an abuse of discretion, and without observance of procedure required by law, all in violation of the APA, in that Defendants relied on factors not authorized by statute, failed to consider important parts of the problem, failed to account for serious reliance interests, failed to consider alternative policies, and provided a pretextual explanation for the Guidance to mask impermissible racial animus.

302. Defendants' violations of the APA have caused and will continue to cause irreparable harm to Plaintiffs and others.

**COUNT FIVE**
**Violation of the APA, 5 U.S.C. §§ 553, 706—Notice and Comment**
**(The Guidance)**

303. Plaintiffs reallege and incorporate by reference the allegations if fact in each of the preceding paragraphs of this Complaint.

304. The APA, 5 U.S.C. § 706(2), provides that a reviewing court "shall hold unlawful and set aside" agency action that is issued "without observance of procedure required by law."

305. The APA, 5 U.S.C. § 553(b), also provides that when an agency issues a rule it must follow certain procedures, including the publication of a notice of proposed rulemaking in the Federal Register and the provision of an opportunity for interested parties to provide comment on the proposed rulemaking.

306. DHS and USCIS are each an "agency" under the APA.

307. The Guidance is a "final agency action" under the APA.

308. The Guidance is a legislative rule because it imposes binding rules that govern public charge determinations.

309. The Guidance is not an interpretive rule or a general statement of policy, nor is otherwise exempt from the notice-and-comment requirement.

310. The Guidance is unlawful because it was issued without following notice-and-comment procedures and therefore was issued without observance of procedures required by law.

311. Defendants' violations of the APA have caused and will continue to cause irreparable harm to Plaintiffs and others.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

a. Stay the Rule and Guidance under 5 U.S.C. § 705;

b. Preliminarily enjoin Defendants from implementing, applying, or taking any actions whatsoever under the Rule or the Guidance;

c. Issue a declaratory judgment stating that the Rule and the Guidance are unlawful under the APA;

d. Vacate and set aside the Rule and the Guidance;

e. Permanently enjoin Defendants from implementing, applying, or taking any actions whatsoever under the Rule or the Guidance;

f. Award Plaintiffs attorneys' fees under the Equal Access to Justice Act; and

g. Grant such additional relief as the Court considers just, necessary, and proper.

DATED: September 17, 2026

Respectfully submitted,

/s/ Susan E. Welber
Susan E. Welber
Evan Henley
Hasan Shafiqullah
Emily Lundgren
Niteka Raina
Lillian Ringel
THE LEGAL AID SOCIETY
49 Thomas Street
New York, NY 10013
212-577-3300

sewelber@legal-aid.org
ewhenley@legal-aid.org
hhshafiqullah@legal-aid.org
elundgren@legal-aid.org
nraina@legal-aid.org
lringel@legal-aid.org

Elena Goldstein
Joel McElvain*
Jonathan Hurwitz
Ryan Cooper*
DEMOCRACY FORWARD
FOUNDATION
P.O. Box 34553
Washington, DC 20043
202-448-9090
egoldstein@democracyforward.org
jmcelvain@democracyforward.org
jhurwitz@v.democracyforward.org
rcooper@democracyforward.org

Baher Azmy
Angelo Guisado
CENTER FOR CONSTITUTIONAL
RIGHTS
666 Broadway
7th Floor
New York, NY 10012
212-614-6445
bazmy@ccrjustice.org
aguisado@ccrjustice.org

*Attorneys for Plaintiffs*

*Motion for admission *pro hac vice* forthcoming